# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CHRISAVGI SOURGOUTSIS, | ) |
| | ) |
| Plaintiff, | ) |
| | )    Case No. 1:16-CV-01096-KBJ-RMM |
| v. | ) |
| | ) |
| UNITED STATES CAPITOL POLICE, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT UNITED STATES CAPITOL POLICE'S MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................3

STANDARD OF REVIEW ......................................................................................................5

ARGUMENT............................................................................................................................7

I.   CLAIMS CONCERNING EVENTS OCCURRING BEFORE AUGUST 20, 2015 ARE
TIME-BARRED ...................................................................................................................7

A.   Plaintiff's Discrimination And Harassment Claims Concerning Training Are
Untimely.......................................................................................................................7

B.   Plaintiff's Discrimination Claim Concerning Issuance Of CP-534s Is Untimely. ...........8

II.   NO REASONABLE JURY COULD FIND THAT USCP OFFICIALS UNLAWFULLY
HARASSED PLAINTIFF ...................................................................................................9

A.   Plaintiff Was Not Subject To Severe Or Pervasive Harassment Based On Her Gender
During Training...........................................................................................................10

B.   Plaintiff Was Not Subject To Severe Or Pervasive Harassment After Training. ...........17

III.   NO REASONABLE JURY COULD FIND THAT USCP OFFICIALS
UNLAWFULLY DISCRIMINATED AGAINST PLAINTIFF IN TERMINATING HER.....22

A.   USCP Had A Legitimate Non-Discriminatory Reason For Terminating Plaintiff. .........23

B.   Plaintiff Cannot Show That The Department's Legitimate Justification Was
Pretextual....................................................................................................................28

IV.   NO REASONABLE JURY COULD FIND THAT USCP OFFICIALS
UNLAWFULLY RETALIATED AGAINST PLAINTIFF. ....................................................34

CONCLUSION ......................................................................................................................36

## TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE(s)**

*Akonji v. Unity Healthcare, Inc.,* 517 F. Supp. 2d 83 (D.D.C. 2007) ............7, 15, 17, 18

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)..................................................4, 5

*Anyaso v. United States Capitol Police,* 39 F. Supp. 3d 34 (D.D.C. 2014) .............26, 29

*Baloch v. Kempthorne,* 550 F.3d 1191 (D.C. Cir. 2008)..................................................12

*Beshir v. Jewell,* 961 F. Supp. 2d 114 (D.D.C. 2013) ........................................13, 16, 17

*Blackmon-Malloy v. United States Capitol Police Bd.,*
     575 F.3d 699 (D.C. Cir. 2009)..................................................................................5, 7

*Bishop v. Nat'l R.R. Passenger Corp.,* 66 F. Supp. 2d 650 (E.D. Pa. 1999)..................19

*Bolden v. Ashcroft,* 515 F. Supp. 2d 127 (D.D.C. 2007)................................................29

*Brady v. Livingood,* 456 F. Supp. 2d 1 (D.D.C. 2006)........................................5, 6, 7, 26

*Brooks v. Clinton,* 841 F. Supp. 2d 287 (D.D.C. 2012)..................................................18

*Brooks v. Grundmann,* 748 F.3d 1273 (D.C. Cir. 2014) ..............................................4, 15

*Buggs v. Powell*, 293 F. Supp. 2d 135 (D.D.C. 2003)......................................................32

*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006) ....................................32

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986)..................................................................4

*Clark Cty. Sch. Dist. v Breeden,* 532 U.S. 268 (2001) ....................................................32

*Clarke v. Washington Metro. Transit Auth.,* 904 F. Supp. 2d 11 (D.D.C. 2012)...........27

*Davis v. Coastal Int'l Sec., Inc.,* 275 F.2d 1119 (D.C. Cir. 2002)..................................17

*Downing v. Tapella*, 729 F. Supp. 2d 88 (D.D.C. 2010)..................................................30

*Dudley v. WMATA,* 942 F. Supp. 2d 141 (D.D.C. 2013)....................................13, 27, 29

*Ellis v. United Parcel Serv., Inc.,* 523 F.3d 823 (7th Cir. 2008) ....................................29

*Faragher v. City of Boca Raton,* 527 U.S. 775 (1998)........................................8, 13, 20

## CASES                                                                    PAGE(s)

*Fischbach v. D.C. Dep't of Corrections*, 86 F.3d 1180 (D.C. Cir. 1996) ..................... 31

*Forkkio v. Powell*, 306 F.3d 1127 (D.C. Cir. 2002) ........................................ 32

*Galdamez v. Xerox Corp.,* Civ. A. No. 03-2326 (CKK),
   2005 WL 486161 (D.D.C. Feb. 28, 2005) .................................................. 29

*Gordon v. Beers,* 972 F. Supp. 2d 28 (D.D.C. 2013) ........................................ 5

*Hampton v. Vilsack,* 685 F.3d 1096 (D.C. Cir. 2012) ...................................... 4

*Harris v. Forklift Systems, Inc.*, 510 U.S. 17 (1993) ............................... 7, 8, 20

*Harrison v. Office of the Architect of the Capitol,*
   964 F. Supp. 2d 71 (D.D.C. 2013) .......................................... 12, 13, 16, 17

*Holcomb v. Powell*, 433 F.3d 889 (D.C. Cir. 2006) ........................................ 21

*Holmes-Martin v. Sebelius,* 693 F. Supp. 2d 141 (D.D.C. 2010) ................................. 14

*Hussein v. Nicholson,* 435 F. 3d 359 (D.C. Cir. 2006) ..................................... 14

*Johnson v. Perez,* 66 F. Supp. 3d 30 (D.D.C. 2014) ............................... 4, 8, 16

*Kennedy v. Nat'l R.R. Passenger Corp.,* 139 F. Supp. 3d 48 (D.D.C. 2015) ............. 8, 14

*Manuel v. Potter*, 685 F. Supp. 2d 46 (D.D.C. 2010) ................................. 4, 19

*McFadden v. Ballard Spahr, Andrews & Ingersoll, LLP,*
   580 F. Supp. 2d 99 (D.D.C. 2008) .......................................................... 27

*Mendoza v. Borden, Inc.,* 195 F. 3d 1238 (11th Cir. 1999) ................................. 18

*Miller v. Edward Jones & Co.,* 355 F. Supp. 2d 629 (D. Conn. 2005) .......................... 18

*Morales v. Gotbaum*, 42 F. Supp. 3d 175 (D.D.C. 2014) ................................... 21

*Moran v. United States Capitol Police,* 82 F. Supp. 3d 117 (D.D.C. 2015) ................. 32

*Mount v. Johnson,* 174 F. Supp. 3d 553 (D.D.C. 2016) ...................................... 4

*Na'im v. Clinton,* 626 F. Supp. 2d 63 (D.D.C. 2009) ....................................... 10

**CASES**                                                           **PAGE(s)**

*Newton v. Architect of the Capitol,* No. 13-5012,
    598 F. App'x 12 (D.C. Cir. Apr. 3, 2015) .................................................32

*Oncle v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75 (1998) ........................8

*Ouzts v. Hantman,* Civil A. No. 03-1275 (JR), 2005 WL 3508655
    (D.D.C. Dec. 22, 2005)...................................................................................5

*Peters v. District of Columbia,* 873 F. Supp. 2d 158 (D.D.C. 2012)................8

*Raymond v. The Architect of the Capitol,* 49 F. Supp. 3d 99 (D.D.C. 2014) ..................7

*Rhone v. United States Capitol Police,* 865 F. Supp. 2d 65 (D.D.C. 2012) .............21, 32

*Richard v. Bell Atlantic Corp.,* 209 F. Supp. 2d 23 (D.D.C. 2002)................15

*Rochon v. Lynch,* 139 F. Supp. 3d 394 (D.D.C. 2015)......................................5

*Royall v. Nat'l Ass'n of Letter Carriers,* 548 F.3d 137 (D.C. Cir. 2008)......................27

*Sanders v. Metro. Police Dep't,* 79 F. Supp. 3d 220 (D.D.C. 2015) .........................29, 30

*Singh v. United States House of Representatives,*
    300 F. Supp. 2d 48 (D.D.C. 2004)................................................14, 16, 19

*Sledge v. District of Columbia,* 63 F. Supp. 3d 1 (D.D.C. 2014) ...............................4, 29

*Stewart v. Ashcroft,* 352 F.3d 422 (D.C. Cir. 2003) .......................................30

*Swann v. Architect of the Capitol,* Nos. 13-5100, 13-5102,
    598 F. App'x 13 (D.C. Cir. Apr. 3, 2015) .................................................32

*Wade v. District of Columbia,* 780 F. Supp. 2d 1 (D.D.C. 2011)................................8, 14

*Wright v. Waste Mgmt. of Md.,* 77 F. Supp. 3d 218 (D.D.C. 2015) ................30

## **STATUTES**

2 U.S.C. §1402 ...................................................................................................5
2 U.S.C. §1404 ...................................................................................................5
2 U.S.C. §1408 ...................................................................................................5

## INTRODUCTION

The United States Capitol Police ("USCP" or the "Department") is an elite law enforcement organization whose mission is to protect the Congress, including its Members, employees, visitors, and facilities, so that Congress can fulfill its constitutional and legislative responsibilities in a safe, secure, and open environment. The Department is a paramilitary organization with a rigid hierarchical structure. Officials issue orders through the chain-of-command, and mission success is predicated upon good order and discipline, that is, subordinates following rules, policies, and orders without question and officials holding their subordinates accountable when they do not. Given the critical importance of its mission, and the ever-evolving challenges and dangers to the seat of democracy the Department must protect, the Department is committed to hiring, retaining, and elevating the best and brightest police officers from diverse backgrounds dedicated to its cause.

Plaintiff Chrisavgi Sourgoutsis was appointed to USCP as a Recruit Officer ("RO") on May 11, 2014. Plaintiff was among twenty-four ROs appointed to Recruit Officer Class ("ROC") 177 out of 6,996 applicants. As a newly appointed employee, Plaintiff was on probation starting on the day of her appointment and ending one year from November 14, 2014, the date she graduated from the USCP Academy.

Almost immediately upon appointment, Plaintiff demonstrated her inability or unwillingness to comply with USCP rules. Beginning in the first week of her six-month training period and throughout her time at the Federal Law Enforcement Training Center ("FLETC") and the USCP Academy, Plaintiff incurred numerous performance notes for multiple violations of FLETC policies or USCP Training Academy Rules.

3

Plaintiff's pattern of rule breaking continued after she graduated from the USCP Academy and became a sworn police officer. On May 10, 2015, an official observed Plaintiff working on post without her police uniform shirt and no outer garment or badge identifying her as a police officer. On May 11, 2015, an officer observed Plaintiff at an exterior access point she was to secure sitting on a retaining wall in conversation with a civilian, an employee of the Architect of the Capitol ("AOC"). The officer took a photograph of Plaintiff and reported the incident to an official. Plaintiff received Command Discipline ("CP-534") for each of these incidents.

Plaintiff's unwillingness to take responsibility and her propensity to blame others for her misconduct and minimize the significance of her actions is as troubling as Plaintiff's noncompliance with basic rules.

Based on Plaintiff's record, officials in Plaintiff's chain-of-command recommended termination instead of retention at the end of Plaintiff's probationary period. Then Chief of Police Kim C. Dine and then Assistant Chief of Police, now Chief of Police, Matthew R. Verderosa concurred in the recommendation after a thorough review of the facts. Following Plaintiff's appeal of the termination recommendation, which Chief Dine denied, the Capitol Police Board ("CPB") approved Plaintiff's termination and Plaintiff's employment with the Department ended on December 31, 2015.

Plaintiff now challenges the termination as unlawful under Sections 201 and 207 of the Congressional Accountability Act ("CAA"). Specifically, Plaintiff alleges that the Department discriminated against her when it recommended her termination and issued discipline because she is a woman. Plaintiff also alleges that the Department retaliated against her for serving as a witness in an Office of Professional Responsibility ("OPR") investigation related to a complaint

alleging a hostile work environment.  Plaintiff further alleges that various Department officials subjected her to a hostile work environment based on her gender during her six-month training period and the approximately twelve-month period she was a sworn police officer.

Plaintiff's discrimination, retaliation, and hostile work environment claims fail as a matter of law.  First, claims concerning the CP-534s Plaintiff received or arising from events occurring during Plaintiff's training are time-barred.  Plaintiff failed to timely exhaust such claims in accordance with the CAA.

Second, the alleged conduct underlying Plaintiff's hostile work environment claims is not sufficient to demonstrate that Plaintiff suffered discriminatory intimidation, ridicule, and insult based on her gender that was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment.

Finally, Plaintiff cannot show that her gender or her protected activity was a factor motivating the Department's treatment of her.  Rather, the undisputed record evidence shows that the Department's treatment of Plaintiff was based solely on her actions of repeatedly violating Department rules and her unwillingness to take total responsibility for that misconduct.

Accordingly, this Court should grant summary judgment as to all of Plaintiff's claims and enter judgment in USCP's favor.

## STANDARD OF REVIEW

The Court must grant a motion for summary judgment when the pleadings and evidence demonstrate that no genuine issue of material fact is in dispute and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Mount v. Johnson*, 174 F. Supp. 3d 553, 559 (D.D.C. 2016). Once a movant meets its initial burden of identifying portions of the record that demonstrate the absence of any genuine issue of material fact, the burden shifts to the nonmovant to show that there are material

facts in dispute. *Sledge v. District of Columbia*, 63 F. Supp. 3d 1, 14 (D.D.C. 2014) (citing

*Celotex Corp.*, 477 U.S. at 324). The nonmovant must do more than show the mere existence of

a factual dispute. *Sledge*, 63 F. Supp. 3d at 14 (citing *Anderson v. Liberty Lobby, Inc.* 477 U.S.

242, 218 (1986)). The nonmovant must designate material facts "showing that there is a genuine

issue for trial." *Johnson v. Perez*, 66 F. Supp. 3d 30, 35 (D.D.C. 2014) aff'd, 823 F.3d 701 (D.C.

Cir. 2016) (citing *Celotex Corp.*, 477 U.S. at 324). "A genuine issue of material fact exists if the

evidence, 'viewed in a light most favorable to the nonmoving party,' could support a reasonable

jury's verdict for the non-moving party." *Brooks v. Grundmann*, 748 F.3d 1273 (D.C. Cir. 2014)

(citing *Hampton v. Vilsack*, 685 F.3d 1096, 1099 (D.C. Cir. 2012)). A movant is entitled to

judgment if the nonmovant "fails to make a showing sufficient to establish the existence of an

element essential to that party's case, and on which that party will bear the burden of proof at

trial." *Perez*, 823 F.3d at 705.

While a Court analyzes facts and inferences in the light most favorable to the nonmovant

on summary judgment, the nonmovant cannot rely upon conclusory assertions offered without

any evidentiary support or inadmissible evidence to establish a genuine issue for trial. *Manuel v.

Potter*, 685 F. Supp. 2d 46, 58 (D.D.C. 2010); *Rochon v. Lynch*, 139 F. Supp. 3d 394, 401

(D.D.C. 2015) ("[T]he nonmovant must rely on evidence – i.e., its opposition 'must consist of

more than mere unsupported allegations or denials and must be supported by affidavits,

declarations, or other competent evidence, setting forth specific facts showing that there is a

genuine issue for trial."). Indeed, "[i]f the nonmovant's evidence is 'merely colorable' or 'not

significantly probative,' summary judgment may be granted." *Gordon v. Beers*, 972 F. Supp. 2d

28 (D.D.C. 2013)(citing *Liberty Lobby*, 477 U.S. at 249-50).

## ARGUMENT

I. **CLAIMS CONCERNING EVENTS OCCURRING BEFORE AUGUST 20, 2015 ARE TIME-BARRED**

Any claims for which Plaintiff did not timely request counseling or mediation as required by Sections 402 and 403 of the CAA are time-barred.  Under the statutory framework of the CAA, federal courts have jurisdiction over civil actions brought by a covered employee only if that employee has completed mediation and counseling requirements under the statute.  2 U.S.C. §§ 1404, 1408; *see also Brady v. Livingood*, 456 F. Supp. 2d 1, 5 (D.D.C. 2006).  A person must submit her request for counseling to the OOC within 180 days of the alleged violation of the CAA.  2 U.S.C. § 1402; *see also Ouzts v. Hantman*, Civil Action No. 03-1275 (JR), 2005 WL 3508655, at *2 (D.D.C. Dec. 22, 2005).  This requirement is jurisdictional.  2 U.S.C. § 1408; *Blackmon-Malloy v. United States Capitol Police Bd.*, 575 F.3d 699, 705 (D.C. Cir. 2009); *Ouzts*, 2005 WL 3508655, at *2.

Because Plaintiff requested counseling with the OOC on February 16, 2016, (Undisputed Statement of Facts In Support of Summary Judgment ("UF") ¶ 163), only claims based on violations arising within 180 days of that date, which is between August 20, 2015 and February 16, 2016, are timely exhausted.  2 U.S.C. § 1402; *see also Brady*, 456 F. Supp. 2d at 5 (claims in the complaint that are based on conduct occurring more than 180 days prior to the date plaintiff sought counseling as required by the CAA are time-barred and will not be considered by the Court).

A. **Plaintiff's Discrimination And Harassment Claims Concerning Training Are Untimely.**

No genuine issue of material fact exists as to whether claims related to Plaintiff's training at FLETC or the USCP Academy are untimely.  Plaintiff alleges that USCP employees at FLETC and the USCP Academy discriminated against her based on her gender and/or subjected

7

her to a hostile work environment.  Specifically she alleges that Lieutenant Brogan and Officer

Hughes, an official and an officer in her chain-of-command at FLETC, unlawfully discriminated

against her and harassed her.  (UF ¶¶ 79-93.)  She also alleges that Sergeant Hersch and Sergeant

Gianneti, instructors at the USCP Academy, harassed her.  (UF ¶¶ 40-42, 53-55.)  Plaintiff's

training at FLETC ended on August 11, 2014. (UF ¶ 78.)  Plaintiff confirms that she had no

further contact with Lieutenant Brogan or Officer Hughes once she left FLETC.  (UF ¶ 78.)

Plaintiff's training at the USCP Academy ended on November 14, 2014, upon her graduation.

(UF ¶ 97.)  Plaintiff confirms that she had no further contact with Sergeant Hersch or Sergeant

Gianneti after her graduation.  (UF ¶ 97.)  Thus, any conduct underlying her discrimination

and/or hostile work environment claims relating to training necessarily would have occurred on

or before November 14, 2014.  (*See* UF ¶¶ 78, 97.)  Given the absence of any facts that show that

any of the challenged conduct occurred within the 180-day period from the date Plaintiff filed a

request for counseling, these claims are indisputably untimely and fail as a matter of law.  *See*

*Brady v. Livingood*, 456 F. Supp. 2d 1, 5 (D.D.C. 2006).

**B.**     **Plaintiff's Discrimination Claim Concerning Issuance Of CP-534s Is Untimely.**

        To the extent Plaintiff alleges that Capitol Division officials responsible for drafting and

issuing the Command Discipline she received for her misconduct on May 10, 2015, and May 11,

2015, discriminated against her based on her gender, this claim is also time-barred.  Plaintiff

indisputably learned of the discipline when Captain Bolinger presented it to her on June 2, 2015.

(UF ¶¶ 105, 109.)  Plaintiff failed to timely exhaust her claim alleging that the Command

Discipline issued was discriminatory under Sections 402 and 403 of the Act because Plaintiff

filed her request for counseling more than 180 days after the date she learned of the alleged

discriminatory act.  Accordingly, the Court may not consider this claim. *See Brady*, 456 F. Supp. 2d at 5.

## II.    NO REASONABLE JURY COULD FIND THAT USCP OFFICIALS UNLAWFULLY HARASSED PLAINTIFF

USCP is also entitled to summary judgment on Plaintiff's hostile work environment claims because Plaintiff cannot show that alleged hostile behavior was sufficiently severe or pervasive as to violate provisions of Title VII incorporated by the CAA.

When construing discrimination claims under the CAA, courts incorporate much of the substantive law of Title VII. *Raymond v. The Architect of the Capitol*, 49 F. Supp. 3d 99, 110 (D.D.C. 2014); *Blackmon-Malloy*, 575 F.3d at 706. Alleged hostile behavior rises to the level of unlawful discrimination under Title VII, as incorporated by the CAA, only when the workplace "is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the [purported] victim's employment and create an abusive working environment.'" *Akonji v. Unity Healthcare, Inc.*, 517 F. Supp. 2d 83, 92 (D.D.C. 2007) (citing *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993). The Court looks to the totality of the circumstances when determining whether a hostile work environment exists, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Kennedy v. Nat'l R.R. Passenger Corp.*, 139 F. Supp. 3d 48, 60 (D.D.C. 2015) (citing *Harris*, 510 U.S. at 23).

In order to be actionable, a work environment "must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Wade v. District of Columbia*, 780 F. Supp. 2d 1, 18-19 (D.D.C. 2011) (citing *Faragher v. City of Boca Raton*, 527 U.S. 775, 787 (1998). "In addition, the

plaintiff 'must always prove that the conduct at issue was not merely tinged with offensive connotations, but actually constituted discrimination because of' the employee's protected status." *Peters v. District of Columbia*, 873 F. Supp. 2d 158, 188 (D.D.C. 2012) (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)); *Perez*, 66 F. Supp. 3d at 43. "The bar is set very high; the Supreme Court has emphasized that Title VII is not a general civility code, such that offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Kennedy*, 139 F. Supp. 3d at 60 (internal quotation marks and citations omitted).

Plaintiff's allegations fall well short of this exacting standard.

### A.   Plaintiff Was Not Subject To Severe Or Pervasive Harassment Based On Her Gender During Training.

Plaintiff's allegation that she was harassed based on her gender while she was in training at FLETC and the USCP Academy is both untimely and does not demonstrate that she was the victim of unlawful harassment.  Specifically, Plaintiff alleges that Lieutenant Brogan and/or Officer Hughes harassed her when:

- Lieutenant Brogan and Officer Hughes issued multiple personal performance notes documenting Plaintiff's violations of USCP Academy Rules and FLETC policies, (UF ¶ 81);

- Officer Hughes made Plaintiff submit memoranda summarizing her version of events as it relates to the personal performance notes seven to nine times, (UF ¶ 80);

- Lieutenant Brogan allegedly spoke condescendingly to Plaintiff on June 20, 2014, when he asked her why she was at USCP and why she accepted the position, and then proceeded to tell Plaintiff that he knew since he was a child that he wanted to be a police officer, (UF ¶ 84);

- Officer Hughes allegedly "berated" and "belittled" her on June 24, 2014, when he said, "You're the type of officer that will show up to work late and push me to go home late to go see my family," (UF ¶ 85);

- Officer Hughes allegedly embarrassed her and spoke to her as if she were not a "grown human being" on July 3, 2014, when he asked her to explain what she was doing in the bathroom that made her late for taking a class photograph, (UF ¶ 91);

- Lieutenant Brogan and Officer Hughes gathered witness statements from classmates concerning alleged misconduct by Plaintiff they witnessed on two occasions, (UF ¶ 86);

- During a class running exercise, Officer Hughes allegedly asked her why she was running slowly, told her to "shut your mouth" when she responded, and threatened to have her ride in the Department's cart, (UF ¶ 89);

- Lieutenant Brogan or Officer Hughes failed to check on Plaintiff while she was at the infirmary, as they purportedly did for other female officers, (UF ¶ 93);

- Officer Hughes allegedly kept Plaintiff after class to counsel or lecture her on various matters, (UF ¶ 92); and

- Officer Hughes allegedly "kick[ed]" Plaintiff out of physical training class, made her wait outside the class, and then asked "is everything okay" or "what's going on, (UF ¶ 88.)

Plaintiff further alleges that Sergeant Hersch and Sergeant Gianneti, instructors at the

USCP Academy harassed her when:

- Before Plaintiff was hired in January 2014, Sergeant Gianneti allegedly "scolded" her for giving a USCP sergeant her water bottle to hold, (UF ¶¶ 40-41); and

- On or about May 15, 2014, Sergeant Hersch allegedly interrupted a conversation between Plaintiff and Sergeant Gupton to advise that Plaintiff should not be permitted to leave campus wearing USCP issued gear as if Plaintiff did not have good judgment, (UF ¶¶ 53-55.)

These allegations are not sufficient to establish a hostile work environment claim.

      1.     No evidence that training conduct at issue constituted discrimination because of Plaintiff's gender.

None of the alleged comments or actions directed at Plaintiff concern her gender.

Alleged "hostile behavior, no matter how unjustified or egregious, cannot support a claim of

hostile work environment unless there exist some linkage between the hostile behavior and the

plaintiff's membership in a protected class." *Na'im v. Clinton*, 626 F. Supp. 2d 63, 73 (D.D.C. 2009).

Plaintiff offers no facts linking Sergeant Gianneti and Sergeant Hersch's comments or actions to her gender.

Further, although Plaintiff concludes that Lieutenant Brogan and Officer Hughes treated her differently than her male colleagues and that their treatment of her was due to their aversion to "strong, educated female police officers at the Capitol," (UF ¶ 81), no evidence supports this conclusion. As examples of this disparate treatment, Plaintiff contends that Lieutenant Brogan wrote her up for a courtesy violation when she allegedly called a colleague an asshole, but failed to write up a male RO who said, "I'm going to rock your ass," to another RO in the context of a foot race. (UF ¶ 83.) Plaintiff also contends that Lieutenant Brogan told her that she could not use her cell phone on FLETC grounds although male officers were permitted to use their cell phones. (UF ¶ 91.) Nothing in the record supports these contentions.

As an initial matter, undisputed evidence shows that Lieutenant Brogan wrote up the male RO who said, "I'm going to rock your ass." (UF ¶ 83.)

The undisputed evidence also shows that Lieutenant Brogan never prohibited Plaintiff from using her cell phone. (UF ¶ 72.) Rather, Lieutenant Brogan told her that she was not permitted to use the *video recording feature* of her cell phone on FLETC grounds and that she was permitted to text outside of class time. (UF ¶¶ 72.) Indeed, Plaintiff conceded that Lieutenant Brogan specifically told her that FaceTiming or Skyping is prohibited on FLETC's grounds and that he made it a point to say, "We don't want you to go [ten] hours a day without contacting your loved ones . . . you can text if there's a break in the hallway." (UF ¶ 72.) That Lieutenant Brogan never prohibited plaintiff from using her cell phone is further demonstrated

by Plaintiff's own words when she wrote in a June 23, 2014, memorandum to Lieutenant Brogan on the subject, "I'm now understanding that FaceTime or Skype of any time amount is prohibited in the main grounds.  I will put my phone away unless it is to text outside during a break."  (UF ¶ 72.)  Plaintiff, therefore, cannot show that Lieutenant Brogan precluded her from using her cell phone, while permitting male ROs to use their cell phones.

The undisputed facts also demonstrate that Lieutenant Brogan and Officer Hughes' treatment of Plaintiff is consistent with their treatment of other ROs.  For example, it is a regular practice of theirs to require ROs to write memoranda explaining performance or conduct failures.  (UF ¶ 80.)  ROs write memoranda when, among other things, they score near or below score thresholds on exams or receive corrective personal performance notes.  (UF ¶ 80.)  Indeed, having ROs draft such memoranda is a training tool Lieutenant Brogan and Officer Hughes utilize to get ROs accustomed to writing statements, a skill they will need as police officers.  (UF ¶ 80.)

Similarly, Lieutenant Brogan has requested ROs, particularly class leaders, to draft witness statements describing events or behavior they witnessed that the officials were not present to observe.  (UF ¶ 86.)  Thus, while Plaintiff contends that the Department never requests witness statements except for allegations of sexual harassment, (UF ¶ 86), the evidence shows that, to the contrary, the Department regularly requests witness statements from officers and ROs.  (UF ¶ 86.)  As to ROs in particular, Lieutenant Brogan has requested witness statements from class leaders and other witnesses to an incident approximately once per each ROC.  (UF ¶ 86.)

It is also the Department's practice to intensely observe and document the conduct of ROs on a daily basis.  As Chief Verderosa explains, this constant daily feedback is part of the indoctrination process and is intended to get ROs used to conforming to rules:

> We're trying to get people to conform to the rules so that they follow the rules, because as you go in your career, if you don't follow the rules, people can get hurt, people can be – you know, if you don't follow our rules on use of force, gosh, you know, you can take someone's life.

(UF ¶ 33.)  Thus, it is common for ROs to be documented for chewing gum in class, uniform violations, tardiness, or courtesy violations like those committed by Plaintiff.

Because nothing in the record demonstrates that Sergeant Hersch, Sergeant Gianneti, Lieutenant Brogan, or Officer Hughes based their treatment of Plaintiff on her gender, the challenged conduct cannot support a hostile work environment claim.  *Harrison v. Office of Architect of the Capitol*, 964 F. Supp. 2d 71, 78 (D.D.C. 2013) ("[p]laintiff's speculation aside," where nothing in the record corroborates claim that behavior was motivated by gender, behavior is not relevant to a hostile work environment claim).

> 2.  Challenged training conduct was not so severe or pervasive as to have changed the conditions of Plaintiff's employment.

Plaintiff's training hostile work environment claim also fails "because the totality of circumstances presented in this record does not rise to the level necessary to support a hostile work environment claim."  *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008).  Plaintiff's claim simply does not meet the demanding standard for a hostile work environment claim.

Even coupling Plaintiff's allegations that Sergeant Hersch, Sergeant Gianneti, Lieutenant Brogan, and Officer Hughes talked to her as if she were a child on six occasions with the remaining allegations against Lieutenant Brogan and Officer Hughes, these purportedly unpleasant experiences do not "constitute the type of hostile and abusive workplace environment

14

contemplated by a valid hostile work environment claim." *Beshir v. Jewell*, 961 F. Supp. 2d 114, 128-29 (D.D.C. 2013). Plaintiff's allegations generally fall into three categories: (1) Department employees' allegedly speaking to Plaintiff in a way that made her feel like a child; (2) Plaintiff's chain-of-command addressing Plaintiff's failure to comply with rules or policies; and (3) Plaintiff's chain-of-command gathering evidence of Plaintiff's wrongful conduct from witnesses. (*See, generally*, UF ¶¶ 40-41, 52-55, 80-92.) Viewing these events in a light favorable to Plaintiff, no reasonable jury could find that the challenged conduct was so severe or pervasive such that Plaintiff's workplace was "permeated with discriminatory intimidation, ridicule, and insult." *Harrison*, 964 F. Supp. 2d at 79-80. The occasions on which Sergeant Hersch, Sergeant Gianneti, Lieutenant Brogan, and Officer Hughes allegedly spoke to Plaintiff in a condescending manner occurred randomly over an eight-month period and no tangible evidence exists showing that Plaintiff suffered any "tangible workplace consequences" because of them. *Id.* Offhand comments, and isolated incidents (unless extremely serious) do not amount to discriminatory changes in the terms and conditions of employment. *Faragher*, 527 U.S. at 788; *Dudley v. WMATA*, 924 F. Supp. 2d 141, 170 (D.D.C. 2013) (no hostile work environment where supervisor talked to employee in a "harsh, critical, and condescending tone" and singled employee out for criticism absent evidence that conduct involved threats of violence or serious intimidation).

By Plaintiff's own account, the conduct was not pervasive. Plaintiff recounts only one incident each concerning Sergeant Gianneti or Sergeant Hersch respectively. (UF ¶¶ 40-42, 53-55.) Plaintiff also confirms that she had limited interactions with Lieutenant Brogan or Officer Hughes at FLETC. (UF ¶ 62.) Lieutenant Brogan and Officer Hughes' alleged mistreatment of

Plaintiff also appeared to end after July 3, 2014, which is the last incident of alleged discriminatory treatment Plaintiff identifies. (UF ¶¶ 76.)

Nothing in the record indicates that the challenged conduct was severe. For example, Plaintiff does not show that the conduct was abusive, threatening, violent, or unreasonably interfered with her working conditions. *See Kennedy*, 139 F. Supp. 3d at 60. Rather, the allegations comprising Plaintiff's hostile work environment claim as it relates to her training primarily concern work-related actions by supervisors in her chain-of-command. Courts generally reject hostile work environment claims based on actions by supervisors that are the kind of "normal strains that can occur in any [work] setting." *See, e.g.*, *Singh v. United States House of Representatives*, 300 F. Supp. 2d 48, 56-57 (D.D.C. 2004) (no hostile environment where supervisor froze employee out of important meetings; told employee all the things that she was doing wrong; told employee to "shut up and sit down"; and called employee into office and screamed "what was that all about"); *Wade*, 780 F. Supp.2d at 19 (denial of training opportunities; altering weekly activity reports; lowering employee's evaluation rating; requiring employee to complete additional forms and task/timeline plans; and calling other police departments to determine employee's location, while annoying and insulting, "cannot fairly be characterized as abusive or hostile"); *Holmes-Martin v. Sebelius*, 693 F. Supp. 2d 141, 165 (D.D.C. 2010) (diminishing employee's job responsibilities, publicly criticizing her job performance; requiring that she communicate with her supervisor through e-mail only; excluding her from meetings, and imposing unrealistic deadlines could not sustain hostile work environment claim); *Hussein v. Nicholson*, 435 F.3d 359, 366-67 (D.C. Cir. 2006) (threats of termination, failure to address insubordination by other employees, and poor performance evaluations did not meet the abusive standard articulated in *Harris*).

In short, the "rude comments, unjust criticism, and stressful working conditions," of which Plaintiff complains amount to "'ordinary tribulations of the workplace,' that [are] insufficient as a matter of law for a hostile environment case." *Richard v. Bell Atlantic Corp.*, 209 F. Supp. 2d 23, 35 (D.D.C. 2002).

**B.      Plaintiff Was Not Subject To Severe Or Pervasive Harassment After Training.**

> 1.      Command Discipline and meeting with Captain Bolinger not so severe or pervasive as to have changed the conditions of Plaintiff's employment.

To the extent that the two CP-534s and the meeting at which Captain Bolinger presented the discipline to Plaintiff underlie Plaintiff's hostile work environment claim, these incidents fall even further from the requisite severe or pervasive threshold. Plaintiff received discipline two times in the twelve-month period she was working for the Capitol Division. (UF ¶¶ 105, 109.) According to Plaintiff, she had no negative interactions with the two Sergeants who wrote her up before the incidents leading to the discipline. (UF ¶¶ 108, 113.) Further, Plaintiff was not presented with the discipline until more than two weeks after she engaged in misconduct. (UF ¶¶ 105, 109.) These facts are not sufficient to establish that Plaintiff's work environment was "permeated with discriminatory intimidation, ridicule, and insult." *Akonji*, 517 F. Supp. 2d at 92.

Plaintiff's meeting with Captain Bolinger also fails to add materially to the alleged "aura of hostility." *Brooks*, 748 F. 3d at 1276. The meeting was less than an hour. (UF ¶ 115.) A union representative accompanied Plaintiff to the meeting. (UF ¶ 115.) Captain Bolinger presented the discipline and allegedly said, "[Plaintiff's] work performances fails to meet their expectations at the Capitol," and, "You just don't get it. I don't think you get it." (UF ¶ 115.) Captain Bolinger did not yell or curse at Plaintiff. (UF ¶ 115.) Although Plaintiff alleges that the manner in which Captain Bolinger spoke to her offended her because "he and I are actually in the same age bracket, but he's speaking to like I'm – like I'm a child," (UF ¶ 115), Captain

17

Bolinger's actions were not objectively offensive. *See, e.g., Singh*, 300 F. Supp. 2d at 55-56 (supervisor telling an employee how terrible things were and all the things she was doing wrong at a meeting not does not demonstrate a work environment that was pervaded by discrimination); *Johnson*, 66 F. Supp. 3d at 44 (supervisor conduct of talking down to employee "as if he were a child" and raising his voice on multiple occasions not sufficient as a matter of law to establish hostile work environment); *Harrison*, 964 F. Supp. 2d at 79 (supervisor "enraged" by employee's conduct and who shouted at the employee and waived a piece of paper did not engage in conduct objectively so severe or pervasive as to have changed the conditions of the employee's workplace); *Beshir*, 961 F. Supp. 2d at 128 (supervisors berating employee about work performance, demanding that employee violate federal regulations, humiliating employee in front of colleagues, and falsely accusing her of threating supervisors do not amount to a hostile work environment); *Brooks*, 748 F.3d at 1277 (supervisor yelling at employee in front of co-workers, insulting and demeaning her, and flinging a heavy notebook on one occasion cannot rise to the level of severity indicating hostility or abuse).

 Captain Bolinger's treatment of Plaintiff also was not pervasive.  Plaintiff concedes that before the meeting she had one interaction with Captain Bolinger where they exchanged greetings and that after the meeting she had no further interaction with Captain Bolinger.  (UF ¶ 116.)  Thus, Plaintiff's assertion that she suffered severe abuse "is undercut by the fact that she had a *single* verbal conflict with [Captain Bolinger]" that was motivated by her violation of USCP policy. *See Harrison*, 964 F. Supp. 2d at 79 (emphasis in original).

 Moreover, nothing in the record indicates that either the CP-534s or the meeting with Captain Bolinger are linked to Plaintiff's gender. As such, no reasonable jury could conclude that Plaintiff's workplace was permeated with "the kind of *discriminatory* intimidation, ridicule, and

insult that is necessary to sustain her claim." *Beshir*, 961 F. Supp. 2d at 129 (emphasis added);

*Harrison*, 964 F. Supp. 2d at 78.

> 2.   Alleged sexual harassment not so severe or pervasive as to have changed the conditions of Plaintiff's employment.

Plaintiff further alleges that she was subjected to sexual harassment by a Department

official who was the Respondent in an OPR investigation.  (UF ¶¶ 149157.)  To prove a case of

sexual harassment a plaintiff-employee must show: "(1) the employee was a member of a

protected class; (2) the employee was subjected to unwelcome [ ] sexual harassment . . .; (3) the

harassment complained of was based upon sex; (4) the charged sexual harassment had the effect

of unreasonably interfering with the plaintiff's work performance and creating an intimidating,

hostile, or offensive working environment . . .; and (5) the existence of respondeat superior

liability." *Akonji*, 517 F. Supp. 2d at 97 (citing *Davis v. Coastal Int'l Sec., Inc.*, 275 F.2d 1119,

1123 (D.C. Cir. 2002)).  Plaintiff cannot establish elements two, three, and four based on the

record evidence.

Plaintiff alleges that Respondent harassed her when he allegedly:

- Addressed her as "chica" or "senorita" rather than by her name on several occasions, (UF ¶ 149);

- Denied her request to leave early one night in June 2015, (UF ¶ 150);

- Told her after denying her request to leave early that he saw her Facebook profile picture, her hair was down, she had on make-up, and she looked good or nice, (UF ¶ 151);

- Looked at her on one occasion when she was in civilian clothes, (UF ¶ 152);

- Frequently stood with his hands on his hips and thrust out his pelvic area repeatedly in roll call or at any given moment in the shift around male and female officers and officials,  (UF ¶ 153);

- Gave female officers he liked preferred assignments and breaks, (UF ¶ 154);

- Looked at another female officer's butt, (UF ¶ 155);

19

- Stood in another female officer's personal space, (UF ¶ 156);

- Told another female officer that he would have to "test out that theory one night" after she said, "The way to my heart is through my stomach," (UF ¶ 157).

Looking at the totality of the circumstances, this conduct does not rise to the level of severity or pervasiveness necessary to sustain a hostile work environment claim. Denying an employee's request to leave early on one occasion is not objectively offensive. *Brooks v. Clinton*, 841 F. Supp. 2d 287, 303 (D.D.C. 2012) (criticizing employee work product, requiring employee to submit daily work reports, denying request to attend a training seminar, denying requests for leave, and discontinuing her work-issued cell phone does not constitute "intimidation, ridicule, insult, or other behavior that was offensive, pervasive, severe, or abusive"); *Miller v. Edward Jones & Co.*, 355 F. Supp. 2d 629, 641 (D. Conn. 2005) (reasonable jury could not find that denying employee time off for Succoth and denying her request to leave early on Yom Kippur were so severe and pervasive to altered the terms of employee's employment).

Federal courts also have held consistently that isolated comments about an employee's appearance; looking, ogling, or even staring at an employee; or an isolated suggestive remark do not evince abusive conditions. *See, e.g., Akonji*, 517 F. Supp. 2d at 98 (five discreet acts involving physical contact as well as infrequent inappropriate comments and staring do not reach the level of severe or extremely serious conduct required to sustain a hostile work environment claim); *Mendoza v. Borden, Inc.*, 195 F. 3d 1238, 1248-49 (11th Cir. 1999) (supervisor's "constant" following and staring at employee did not reach level of severe or pervasive conduct sufficient to alter employee's terms or conditions of employment); *Bishop v. Nat'l R.R. Passenger Corp.*, 66 F. Supp. 2d 650, 664 (E.D. Pa. 1999) (foreman's alleged staring, leering,

and comments that he was employee's "stud muffin" were not so severe or pervasive as to constitute a hostile work environment).

Plaintiff's naked assertion that female officers Respondent liked were given better breaks or assignments also does not help Plaintiff in meeting the demanding standards for a hostile work environment claim.  As an initial matter, Plaintiff has offered no facts showing that certain female officers were given better schedules.  *Manuel*, 685 F. Supp. 2d 4at 58 (nonmovant cannot rely upon conclusory assertions offered without evidentiary support to establish genuine issue for trial).  Indeed, the record evidence indicates that no pattern of giving certain females preferred assignments or schedules existed.  (UF ¶ 154.)

Even if Plaintiff was given less favorable assignments than certain female officers, however, her getting less favorable assignments does not demonstrate that Plaintiff's work environment was objectively abusive or hostile or that such assignments were based on Plaintiff's gender.  *See Singh*, 300 F. Supp. 2d at 56.

Likewise, Plaintiff allegation that Respondent frequently thrust his hips when standing and referred to female officers as "chica" or "senorita," does not advance Plaintiff's hostile work environment claim.  Plaintiff provides no facts that would suggest that Respondent's thrusting of his hips was related to Plaintiff's, or any other officer's, gender.  To the contrary, Plaintiff contends that Respondent thrust his hips all the time, including at morning roll calls, diplomatic and other events at the Capitol in which the Department provided security, and during a regular shift.  (UF ¶ 153.)  Plaintiff also states that Respondent thrust his hips in the presence of male and female officers.  (UF ¶ 153.)  During her OPR interview, Plaintiff stated that she did not know whether Respondent's conduct was a nervous thing or tick.  (UF ¶ 158.)  This evidence

21

does not indicate that Respondent's alleged hip thrusting was either hostile or related to Plaintiff's, or other officer's, gender.

Nor is it objectively offensive to address female officers as "chica" or "senorita." Plaintiff, a self-proclaimed fluent Spanish-speaker, stated that "chica" is an informal Spanish term or colloquialism that means "girl" or "young woman" and "senorita" is a Spanish term that means "Miss" or "unmarried woman." (UF ¶ 149.) While these terms are inappropriate for a highly structured environment like the Department in which officials refer to subordinates in their chain-of-command as "Officer [Last Name]," (UF ¶ 143), these terms are not inherently intimidating, ridiculing, or insulting.

Finally, Plaintiff's admission during her OPR interview that she no longer found Respondent's behavior to create a hostile work environment is fatal to her hostile work environment claim. (UF ¶ 159.) Plaintiff stated that she simply ignored Respondent and that he does not exist to her. (UF ¶¶ 159.) This evidence indicates that Respondent's alleged conduct did not reasonably interfere with Plaintiff's work performance. *Harris*, 510 U.S. at 23. Plaintiff cannot establish a hostile work environment in violation of Title VII, as incorporated by the CAA, where she did not subjectively perceive the environment to be discriminatorily hostile. *Faragher*, 524 U.S. at 787.

## III.   NO REASONABLE JURY COULD FIND THAT USCP OFFICIALS UNLAWFULLY DISCRIMINATED AGAINST PLAINTIFF IN TERMINATING HER.

USCP is also entitled to summary judgment of Plaintiff's discrimination claim. Plaintiff must establish two essential elements to avoid summary judgment of her discrimination claim: "(i) [Plaintiff] suffered an adverse employment action (ii) because of [Plaintiff's] race, color, religion, sex, national origin, age, or disability." *Baloch*, 550 F.3d at 1196; *Rhone v. United States Capitol Police*, 865 F. Supp. 2d 65, 68 (D.D.C. 2012). In sum, "to survive summary

judgment [Plaintiff] must show that a reasonable jury could conclude from all of the evidence

that the adverse employment decision was made for a discriminatory reason." *Holcomb v.*

*Powell*, 433 F.3d 889, 896-97 (D.C. Cir. 2006) (citations omitted); *Morales v. Gotbaum*, 42 F.

Supp. 3d 175, 191 (D.D.C. 2014).

A.     **USCP Had A Legitimate Non-Discriminatory Reason For Terminating Plaintiff.**

The Department fully and consistently explained the reasons for terminating plaintiff's

employment.  Inspector Waldow's September 4, 2015, memorandum to Deputy Chief Thomas,

provides a detailed explanation for recommending Plaintiff's termination.  The memorandum

states:

> [Plaintiff] has demonstrated a pattern of unsatisfactory conduct,
> deficiencies in performance of duties, and the lack of cooperativeness to
> maintain compliance with general policy and procedure.  This
> unsatisfactory pattern has been established during her recruit officer
> training and has continued through her probationary period as a sworn
> law enforcement officer.

(UF ¶ 126.)

The memorandum then describes in detail seven infractions issued to Plaintiff for

misconduct as a recruit officer.  (*See, generally,* UF ¶ 126.)  It further describes in detail the

Command Discipline issued to Plaintiff for a violation occurring on May 10, 2015, when

Plaintiff was observed on post and out of uniform and a violation occurring on May 11, 2015,

when Plaintiff was observed seated on a garden retaining wall engaged in a conversation with a

citizen, which prevented Plaintiff from devoting "full time and attention to her duties [that]

included ensuring an egress door that under-going construction was not breeched."  (UF ¶ 126.)

It also notes that Plaintiff received a personal performance note documenting multiple parking

violations on Capitol grounds.  (UF ¶ 126.)

Based on this history, the memorandum indicates that Plaintiff's final rating for the CP1388 Final Probationary Summary is unsatisfactory in the following areas: Quality of Work, Self-Development, Initiative, Productivity, Dependability, Adaptability to Changing Situations, and General Deportment.  (UF ¶ 126.)  The reason for the unsatisfactory rating in these areas is that Plaintiff "has received two [ ] command discipline reports and demonstrates the inability to conform to general rules and regulations since her time as a recruit officer continuing through her probationary period."  (UF ¶ 126.)

The document concludes, stating:

> [Plaintiff's] work history as documented in her personnel jacket identifies multiple instances of performance/conduct deficiencies and undesirable suitability characteristics as evidence by her demonstrated conduct/performance on duty.
>
> [Plaintiff] has received multiple coaching and counseling sessions[,] which have been documented since her time as a recruit officer continuing through her probationary period.  On each instance[,] she was apprised of the expected conduct and expected performance.  However, the pattern of unsatisfactory performance/conduct has continued despite repeated coaching/counseling.
>
> It is recommended that [Plaintiff's] employment be terminated based on unsatisfactory performance/conduct, a continued patter of uncooperativeness and undesirable suitability characteristics.

(UF ¶ 126.)

Deputy Chief Thomas' October 26, 2015, memorandum to Assistant Chief Verderosa also explains the reason he recommended termination as to Plaintiff.  In particular, the memorandum states:

> It is clear from additional documentation that [Plaintiff] has a history of disregard for rules and regulations dating back to her time in the police training academy.  Specific instances include a range of conduct violations, varying from failure to comply with uniform standards on multiple occasions; to violation of basic academy rules for recruit conduct; to discourteous behavior directed at both academy employees and classmates; to repeated disregard for basic parking guidelines.

24

\*\*\*

> I find that [Plaintiff] has a clearly established pattern of conduct
> problems that have grown more serious over time despite repeated
> attempts at corrective counseling, and have now finally manifested into
> multiple instances of Command Discipline within her probationary term
> of employment.  Her most recent conduct violation resulted in a direct
> vulnerability to the security and safety of the Capitol Complex.

(UF ¶ 128)

Deputy Chief Thomas further clarified the reason he recommended Plaintiff' termination

during his deposition:

> [Plaintiff's] recommendation came about as a result of the conduct
> during her probationary period, because she displayed a pattern of not
> conforming to the department's policies and procedures from the time
> that she was in probation in her field training all the way back to the time
> that she was in the academy.

(UF ¶ 129.)

Chief Verderosa explained why he concurred in Deputy Chief Thomas' recommendation

to terminate Plaintiff during his deposition:

> [I]t's in essence the totality of the factors based on her, not only the
> discipline but all the other issues she had going back to her first days in
> the Academy.  So it was a totality of that, and I think the specific, the
> probably the main reason is that she met unsatisfactory performance
> based on the two disciplines, but I think the other factors played very
> heavily, her other counselings and issues that were documented in those
> 550s and in all of the jacket, the personnel folder.

(UF ¶ 130.)

Chief Dine also confirmed that the overall concern of the officials recommending

termination was Plaintiff's discipline history and issues at the academy.  (UF ¶¶ 131-133.)  He

further recalled questioning Deputy Chief Thomas and (then) Assistant Chief Verderosa about

whether termination was appropriate.  (UF ¶ 131.)  He recalls that both officials express concern

about Plaintiff's entire record in general and, specifically, with the severity of the May 11, 2015,

infraction and with Plaintiff's apparent unwillingness to accept responsibility in total for the

infraction. (UF ¶ 131.)

Chief Dine conducted his own review of Plaintiff's personnel file. (UF ¶ 131.)

Ultimately, he concurred in the recommendation based on three factors:

> First, although Plaintiff Sourgoutsis sometimes admitted to wrongdoing,
> she often made excuses for her actions and blamed others for the choices
> she made. For example, as to the CP-534 she received for neglect of
> duty, Plaintiff Sourgoutsis shifted some of the blame for her behavior to
> the Sergeant who assigned her to that post. An inability or unwillingness
> to take full responsibility for her actions was a major concern for me.

> Second, the incident concerning her being in neglect of duty particularly
> concerned me. It appeared that Plaintiff Sourgoutsis did not fully
> understand the severity of the issue. She was the sole officer assigned to
> an unsecured, high traffic, exterior access point. She was not being
> attentive to her post. This situation easily could have placed Plaintiff
> Sourgoutsis or persons inside the CVC in harms way. Moreover, the
> Department is a security based law enforcement agency. Securing
> access points to the Capitol grounds is not a collateral duty — it is the
> essence of the Department's mission.

> Finally, Plaintiff Sourgoutsis was a probationary employee who received
> two CP-534s during her probationary period and had been cited for
> multiple infractions while at the Police Academy. The purpose of the
> probationary status is to determine whether the employee and the
> Department are a good fit in a quasi-military, security policing
> environment. Based on her record, it appeared that Plaintiff Sourgoutsis
> was not a good fit for the Department in this type of quasi-military,
> security policing environment which is strictly structured and
> accountability is paramount.

(UF ¶¶ 131-133.)

During Plaintiff's October 29, 2015, duty status hearing, Deputy Chief Thomas provided

Plaintiff a letter from the Director of OHR that briefly summarizes the basis for the termination

recommendation. (UF ¶ 134.) It reads:

> Consistent with the guidelines established by USCP Directive 2052.004,
> Probationary Periods, your prior sustained disciplinary actions and
> documented history of unacceptable conduct and behavior demonstrate

that you do not meet the standards for retention as an employee of the USCP.

(UF ¶ 134.)

Chief Dine also issued a letter dated November 13, 2015, in response to Plaintiff's appeal that also explains that under Directive 2052.004, "a determination of unsatisfactory performance is applicable when [ ] 'more than one sustained Command Discipline Report [ ] violation' exists." (UF ¶ 134.) The letter also notes that Plaintiff had "several instances of inappropriate conduct while at the Training Academy" and concludes that, in light of the totality of facts and circumstances presented and the standard that two sustained CP-534s during a probationary year constitute unsatisfactory performance, termination was appropriate. (UF ¶ 134.)

Chief Dine's December 14, 2015, memorandum to the CPB further reiterates the basis for the Department's termination recommendation. The memorandum provides information concerning the two CP-534s Plaintiff received, indicating as to the May 11, 2015 incident that Plaintiff's conduct "presented a security vulnerability at the United States Capitol." (UF ¶ 135.) It further states that Plaintiff received "multiple parking violation citations from Senate Parking Operations during her probationary period and has required multiple counseling sessions while in recruit officer training necessitated by her conduct during the training." (UF ¶ 135.) It concludes that "[c]onsistent with the guidelines established by USCP Directive 2052.004, Probationary Periods, [Plaintiff's] prior sustained disciplinary actions and documented history of unacceptable conduct and behavior demonstrate that she does not meet the standards for retention as a sworn employee of the USCP." (UF ¶ 135.) Each of the CPB members approved the termination recommendation. (UF ¶ 135.)

**B.      Plaintiff Cannot Show That The Department's Legitimate Justification Was Pretextual.**

The record is completely devoid of evidence showing that the Department's nondiscriminatory reason for terminating Plaintiff is pretextual.  Where, as here, a plaintiff lacks any direct evidence of discrimination, she may demonstrate that an employer's stated reason for the employment action is a pretext by either: (1) producing evidence suggesting that "the employer treated other employees of a different race, color, religion, sex, or national origin more favorably in the same factual circumstances"; or (2) producing evidence suggesting that "the employer is making up or lying about the underlying facts that formed the predicate for the employment decision." *Brady*, 520 F. 3d at 495.  Plaintiff cannot demonstrate pretext by either means.

> 1.      No evidence that the Department treated other employees of a different sex more favorably in the same factual circumstances.

Plaintiff generally contends that the Department's justification for her termination is pretextual because the Department treated male probationary officers, who purportedly committed more significant violations than she did during their probationary periods, more favorably.  (Pl's Mot. For Summ. J. ("Pl's Br.") at 11.)  Plaintiff, however, provided evidence related to two male officers to support this contention.  (*Id.*)  Plaintiff's proposed comparators are indisputably not similarly situated to Plaintiff. *Anyaso v. United States Capitol Police*, 39 F. Supp. 3d 34, 42 (D.D.C. 2014) (To permit a jury to conclude that a plaintiff was subjected to a more severe punishment than other USCP officers who committed similar offenses, the "plaintiff must first establish that the alleged comparators are sufficiently 'similarly situated.'").  Courts look to whether the alleged comparators "dealt with the same supervisor, have been subject to the same standards, and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of

28

them for it." *Id.* (citing *McFadden v. Ballard Spahr, Andrews & Ingersoll, LLP*, 580 F. Supp. 2d

99, 109-10 (D.D.C. 2008)); *Dudley*, 924 F. Supp. 2d at 161 (D.D.C. 2013). "[T]o draw an apt

comparison, the plaintiff must demonstrate that all relevant aspects of his employment situation

were 'nearly identical' to those of the other employees." *Clarke v. Washington Metro. Transit*

*Auth.*, 904 F. Supp. 2d 11, 17 (D.D.C. 2012) (citing *Royall v. Nat'l Ass'n of Letter Carriers*, 548

F.3d 137, 145 (D.C. Cir. 2008)).

Plaintiff's employment situation is not nearly identical to that of PVT 7 or PVT 8.  First,

Plaintiff cannot show that PVT 7 or PVT 8 engaged in conduct similar to the conduct that

resulted in Plaintiff's termination.  PVT 7 is an officer in the House Division whose probationary

period began in August 2011 and was scheduled to end January 2013.  (UF ¶ 166.)  During his

probationary period, PVT 7 received a CP-534 for a violation of Rule B10, Neglect of Duty,

when he was observed sleeping in a checkpoint kiosk on November 27, 2012.  (UF ¶ 167.)

During his probationary period, PVT 7 also received a corrective CP-550 on September 5, 2012,

for failing to adhere to the Department's grooming standards as it relates to beard length.  (UF ¶

168.)  PVT 7's record further indicates that he was tardy in July 2012 and September 2012.  (UF

¶ 168.)  In addition, PVT 7 also had two CP-550s for failing to bring his USCP baseball cap in

violation of Academy rules and for speeding on base at FLETC.  (UF ¶ 169.)  PVT 7 also

received the FLETC Director's Training Award, a recognition given to a student who most

exemplifies the core values of a federal law enforcement officer.  (UF ¶ 169.)

PVT 8 is an officer in the House Division whose probationary period began in August

2011 and was scheduled to end January 2013.  (UF ¶ 172.)  During his probation period, PVT 8

received a CP-534 for a violation of Rule A3, Compliance with Directives, when on April 28,

2012, PVT 8 failed to stop a vehicle from proceeding through a checkpoint or radio

Communications about the breach.  (UF ¶ 172.)  Then Assistant Chief of Police Thomas

Reynolds dismissed the CP-534 concerning the April 28, 2012, incident on appeal.  (UF ¶ 173.)

PVT 8 received a CP-534 for violating Rule B10, Neglect of Duty, when on November 26, 2012,

he was observed asleep while on post at the Rayburn Subway.  (UF ¶ 173.)  PVT 8's record

further indicates that he was tardy in April 2012 and July 2012, and that he used unscheduled

sick leave on two occasions, which is not a violation of USCP policy.  (UF ¶ 174.)

Inspector Matthew Perkins, then Commander of the House Division, recommended that

PVT 7 and PVT 8's probationary periods be extended for six months based on the performance

deficiencies noted during their probationary period.  (UF ¶¶ 170, 175.)  Deputy Chief Yancey

Garner, then Commander of the Uniformed Services Bureau, approved the recommendations.

(UF ¶¶ 171, 175.)

PVT 7 and PVT 8 are not similarly situated to Plaintiff.  Unlike Plaintiff, PVT 7 received

only one CP-534 and one corrective CP-550 during his probationary period.  (UF ¶ 167.)  PVT 8

received one CP-534 that was dismissed by then Assistant Chief Reynolds, one CP-534 that was

upheld, and no CP-550s during his probationary period.  (UF ¶ 173.)  By contrast, Plaintiff's

record reflects two CP-534s and eight corrective CP-550s during her probationary period.  (*See,*

*generally,* UF ¶¶ 63-77, 105, 109.)

Moreover, each of the comparators Plaintiff identifies were House Division employees.

(UF ¶ 178.)  Consequently, they did not share Plaintiff's supervisors.  (*See* UF ¶ 170-71, 175.)

Nor was any official who made a decision as to extension as to PVT 7 or PVT 8 an official who

made a recommendation for termination as to Plaintiff.  (*See* UF ¶¶ 170-71, 175.)  "It is well

established that, to be successful in the use of comparator evidence, 'the plaintiff must point to a

similarly situated employee outside of a protected class who committed comparable offenses but

who was punished less severely by the same deciding official.'" *Sledge*, 63 F. Supp. 3d at 18;

*Bolden v. Ashcroft*, 515 F. Supp. 2d 127, 134 (D.D.C. 2007) (two individuals reporting to

different supervisors and subject to different decision makers than the plaintiff were not similarly

situated to plaintiff); *Galdamez v. Xerox Corp.*, Civil Action No. 03-2326 (CKK), 2005 WL

486161, at *13 (D.D.C. Feb. 28, 2005) ("[E]mployees cannot be deemed 'similarly situated' if

they work under different supervisors—presumably because the 'control factor' is eliminated

when different people are making the firing decisions."); *Ellis v. United Parcel Serv., Inc.*, 523

F.3d 823, 827 (7th Cir. 2008) ("Different decision makers may rely on different factors . . . .

"[T]o be similarly situated, a [comparator] must have been treated more favorably by the same

decision maker.").

The difference PVT 7 and PVT 8's chain-of-command is critical at it is a "differentiating

or mitigating circumstance[ ]" that demonstrate that all relevant aspects of Plaintiff's

employment situation were not "nearly identical" to that of the comparators. *See Anyaso*, 39 F.

Supp. 3d at 43.

For all these reasons, Plaintiff's proffered comparator evidence is not sufficient to

overcome the Department's legitimate justification for the termination. *See Dudley*, 924 F.

Supp. 2d at 161.

        2.        Plaintiff cannot show that the Department is lying about the underlying
                 facts that form the predicate for her termination.

Plaintiff also cannot show that the Department's legitimate justification is "unworthy of

credence*.*" *Sanders v. Metro. Police Dep't*, 79 F. Supp. 3d 220, 223 (D.D.C. 2015). It is

undisputed that Plaintiff repeatedly failed to comply with USCP rules and regulations. No

dispute exists as to whether Plaintiff committed the violations that are the basis of the CP-534s

issued to her. (UF ¶¶ 106, 110, 113.) Nor does any material dispute exists as to whether

Plaintiff engaged in the misconduct that are the subjection of the CP-550s. (*See, generally,* UF ¶¶ 63-77.) Given these facts, Plaintiff cannot seriously contend that the Department's legitimate justification is "unworthy of credence." *Sanders,* 79 F. Supp. 3d at 223 (plaintiff failed to show pretext where he could not dispute that assault leading to his termination occurred); *Downing v. Tapella,* 729 F. Supp. 2d 88, 93 (D.D.C. 2010) ("[W]here 'the employer's stated belief about the underlying facts is reasonable in light of the evidence, there ordinarily is no basis for permitting a jury to conclude that the employer is lying about the underlying facts,' and summary judgment is appropriate.") (citing *Stewart v. Ashcroft,* 352 F.3d 422, 430 (D.C. Cir. 2003)).

Nor does Plaintiff's view that the Department did not follow Directive 2052.004 discredit the Department's non-discriminatory reason. Plaintiff contends that the Department did not comply with Directive 2052.004 when it: (1) failed to establish a performance plan for Plaintiff; (2) failed to communicate evaluations and how they related to Plaintiff's duties and responsibilities; (3) failed to create a career development plan for Plaintiff; and (4) failed to provide Plaintiff quarterly probationary period evaluations. (Pl's Br. 5.) The relevant question, however, is not whether the Department followed the policy; it is whether the Department *discriminatorily applied the policy* as to Plaintiff, resulting in her termination. *Wright v. Waste Mgmt. of Md.,* 77 F. Supp. 3d 218, 227 (D.D.C. 2015).

Nothing in the record shows that the Department discriminatorily applied the policy. Rather, the record indicates that officials in the Capitol Division failed to complete quarterly probationary period evaluations and the other performance evaluation related documents described above for *all* probationary employees in ROC 177 and other recruit classes, including Plaintiff. (UF ¶¶ 183.) Significantly, the reason the probationary evaluations and related

documents were not completed were due to significant shortages in the Department's operations overall.  (UF ¶ 184.)  As Chief Verderosa explained:

> [D]uring the period since sequester in 2010 we have been critically short of supervisory personnel to the tune of about probably one-third short sergeants and [fifty] percent short lieutenants and that's the bulk of the first-line supervisors.
>
> \*\*\*\*
>
> I was the [C]hief who was fortunate enough to receive funding to replenish, and we are now getting to the point where we're almost at full staffing in those areas, and [administrative requirements] are the areas we're trying to improve in where because [operations] was so important and in protecting the icon and protecting, getting the mission done things got sidetracked in terms of some of the administrative responsibilities.

(UF ¶ 184.)

Inspector Waldow further explained that significant shortages of first-line supervisors in the Capitol Division meant that "at times, administrative functions fall to the wayside while we maintain operations [because] [i]t's a very high operational tempo at the [U.S.] Capitol."  (UF ¶ 185.)

In sum, officials in her chain-of-command terminated Plaintiff after she undisputedly engaged in rule violations resulting in two CP-534s and eight CP-550s during her probationary period.  (UF ¶¶ 121-35.)  The termination recommendation went through multiple levels of review, including review by the Deputy Chief, Assistant Chief, Chief, and CPB members.  (*Id.*) A reasonable jury could not infer discrimination based on this evidence.  Absent evidence of discriminatory motive, the Department's decision to terminate may not be second-guessed by this Court.  *Fischbach v. D.C. Dep't of Corrections*, 86 F.3d 1180, 1183 (D.C. Cir. 1996).

## IV.   NO REASONABLE JURY COULD FIND THAT USCP OFFICIALS UNLAWFULLY RETALIATED AGAINST PLAINTIFF.

The Department is also entitled to summary judgment as to Plaintiff's retaliation claims. A plaintiff asserting retaliation claims under the CAA must show that: (1) she engaged in a statutorily protected activity or opposed a practice made unlawful by the CAA; (2) the employer took a materially adverse action against her; and (3) a causal connection exists between the protected activity and the materially adverse action. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006); *Forkkio v. Powell*, 306 F. 3d 1127, 1131 (D.C. Cir. 2002); *Swann v. Architect of the Capitol*, Nos. 13-5100, 13-5102, 598 F. App'x 13 (D.C. Cir. Apr. 3, 2015); *Newton v. Architect of the Capitol*, No. 13-5012, 598 F. App'x 12 (D.C. Cir. Apr. 3, 2015); *Rhone*, 865 F. Supp. 2d at 70.

Plaintiff cannot establish a causal connection between her alleged protected activity and the Department's decision to recommend her termination absent evidence of decision-maker knowledge of the activity. *Buggs v. Powell*, 293 F. Supp. 2d 135, 151 (D.D.C. 2003) (citing *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272-73 (2001)). "To fulfill the knowledge requirement, the official responsible for ordering the employee's adverse employment action must have had knowledge of the protected activity." *Moran v. United States Capitol Police*, 82 F. Supp. 3d 117, 128 (D.D.C. 2015).

Plaintiff alleges that she engaged in protected activity when she was interviewed by OPR as part of an investigation into a complaint alleging that a Department official created a hostile work environment. Assuming this activity is protected under the CAA, Plaintiff cannot show that Inspector Waldow, Deputy Chief Thomas, Assistant Chief Verderosa, or Chief Dine, who recommended Plaintiff's termination, or the CPB members, who approved Plaintiff's

34

termination, had knowledge that Plaintiff engaged in this protected activity.  (UF ¶¶ 143, 144, 145.)

Indeed, the record evidence establishes that these individuals could not know of Plaintiff's role in the investigation.  OPR received an anonymous complaint on July 27, 2015, alleging that Respondent had engaged in conduct in violation of USCP Directive 2053.011, Anti-Discrimination and Anti-Harassment Policy.  (UF ¶ 137.)  OPR immediately began investigating the allegations in the complaint.  (UF ¶ 138.)  As part of its investigation, OPR contacted Sergeant Willis to arrange to interview approximately sixteen officers, including Plaintiff.  (UF ¶¶ 138.)  Sergeant Willis personally arranged all of the interviews.  (UF ¶ 139.)  OPR interviewed Plaintiff on August 18, 2015.  (UF ¶ 147.)  At the time she was contacted by OPR, Sergeant Willis had no knowledge as to the subject matter of the investigation and did not learn of the subject matter until she was also interviewed in connection with the investigation.  (UF ¶ 141.)  Upon learning the subject matter of the investigation, Sergeant Willis did not disclose this information to anyone.  (UF ¶ 142.)  Sergeant Willis also elected not to provide any input into the decision to terminate Plaintiff.  (UF ¶ 125.)

On August 27, 2015, Inspector Herrle, the Commander of OPR, informed Inspector Waldow that OPR received a complaint that Respondent was calling officers "chica."  (UF ¶ 143.)  Inspector Herrle did not provide Inspector Waldow with any additional information concerning the allegations of the complaint or the charges.  (UF ¶ 143.)  Inspector Herrle also did not tell Inspector Waldow the name of the complainant or any of the witnesses.  (UF ¶ 143.)

Deputy Chief Thomas learned of the OPR investigation when an executive board member of the union emailed him questioning the Department's decision not to reassign Respondent pending the investigation.  (UF ¶ 144.)  Because Deputy Chief Thomas had no information

35

regarding the allegations in the complaint, he spoke with Inspector Herrle to determine whether reassignment was advisable. (UF ¶ 144.) Inspector Herrle did not recommend reassigning Respondent. (UF ¶ 144.) Inspector Herrle told Deputy Chief Thomas only that the complaint concerned remarks Respondent allegedly made in front of female officers. (UF ¶ 144.) Inspector Herrle did not disclose any other information concerning the allegations of the complaint or the identity of the complainant or witnesses. (UF ¶ 144.) Deputy Chief Thomas also was not aware at that time that Plaintiff was in Respondent's chain-of-command. (UF ¶ 144.)

OPR did not formally notify Respondent or his chain-of-command of the complaint and investigation until October 1, 2015, more than two months after the investigation commenced. (UF ¶ 140.) The notification does not describe the nature of the investigation or disclose the names of any complainant or witnesses. (*See* UF ¶ 140.) Other than Sergeant Willis, no one in Plaintiff's chain-of-command knew the scope of the OPR investigation against Respondent or knew that Plaintiff was a witness to the investigation.

OPR did not complete the ROI, which describes the allegations in the complaint and identifies witnesses, until December 15, 2015, and the ROI was not provided to Inspector Waldow until on or about January 20, 2016, nearly one month after Plaintiff's employment with the Department ended. (UF ¶ 162.)

Absent any evidence that the officials who recommended or approved the termination had any knowledge of Plaintiff's protected activity, no reasonable jury could find that the Plaintiff's termination are causally linked to them. Summary judgment of Plaintiff's retaliation claim is, therefore, appropriate.

## CONCLUSION

For the foregoing reasons, USCP respectfully requests that its motion be granted.

Date: October 27, 2017

Respectfully submitted,

/s/ Kelly M. Scindian
_____

Frederick M. Herrera #423675
Kelly M. Scindian #985787
Rafique O. Anderson #493243
Office of Employment Counsel
United States Capitol Police
119 D Street NE
Washington, DC 20510
Telephone: (202) 593-3336
Facsimile: (202) 593-4478
Frederick.Herrera@uscp.gov
Kelly.Scindian@uscp.gov
Rafique.Anderson@uscp.gov

*Counsel for the United States Capitol Police*

## CERTIFICATE OF SERVICE

I hereby certify that on October 27, 2017, I electronically filed the foregoing Defendant United States Capitol Police's Motion for Summary Judgment, Memorandum of Point and Authorities In Support Thereof, and Statement of Undisputed Material Facts in Support of Motion for Summary Judgment with the Clerk of the Court for the United States District Court for the District of Columbia, using the Court's CM/ECF system.  The CM/ECF system sent a "Notice of Electronic Filing" to all counsel of record in this matter.

/s/ Kelly M. Scindian

_____