**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CHRISAVGI SOURGOUTSIS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 1:16-CV-01096-KBJ-RMM |
| v. | ) |
| | ) |
| UNITED STATES CAPITOL POLICE, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS**
**IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rule 7(h), Defendant

United States Capitol Police ("USCP" or the "Department") states the following material facts to

which it, as moving party, contends there is no genuine issue to be tried in connection with its

Rule 56 motion for summary judgment.

**INTRODUCTION**

1.     Plaintiff Chrisavgi Sourgoutsis ("Plaintiff") is a former employee of USCP.

(Declaration of Kelly Scindian, ¶ 3, at 13, Ex. 1; *see also* October 29, 2015, Termination Letter,

Ex. 1, ¶ 9, Attach. 1.)

2.     Plaintiff was a probationary employee from the date of appointment on May 12,

2014, through termination.  (Ex. 1, ¶ 3, at 31; Ex. 1, ¶ 11, at 26; Declaration of Kim Dine,  ¶ 15,

Ex. 2; *see also* Directive 2052.004, Probationary Periods, Ex. 1,  ¶ 9, Attach. 1, at 4.)

3.     Plaintiff's employment with USCP was terminated on December 31, 2015.

(Termination Recommendation dated Dec. 14, 2015; Ex. 2, at Ex. C.)

## USCP'S OPERATIONS

### I.   MISSION AND STRUCTURE

4.      The mission of USCP is to protect the Congress, its Members, employees, visitors, and facilities so that Congress can fulfill its constitutional and legislative responsibilities in a safe, secure, and open environment.  2 U.S.C. §§ 1961, 1966; (Ex. 2, ¶ 4; Ex. 1, ¶ 11, at 17; Ex. 1, ¶ 8, at 12.)

5.      As the law enforcement agency responsible for protecting one of the top terrorists targets in the world: the U.S. Capitol, USCP's operations are highly visible to the public.  (Ex. 2, ¶¶ 4, 23.)  Millions of tourists travel to the U.S. Capitol each year and USCP police officers are typically the first and last persons with whom they interact when then they come to the Capitol Complex.  (*Id.* ¶ 4.)

6.      Due to the high visibility of its operations, the Department holds its officers to the highest standards of professionalism, security, honesty, and integrity.  (Ex. 2, ¶ 4.)

7.      USCP has a quasi-military operational structure.  (Ex. 1, ¶ 11, at 19; Ex. 2, ¶¶ 16, 23.)  This means that the Department has a very rigid chain-of-command, in which officials at the top of the chain issue orders that are carried out without question by subordinate employees. (Ex. 1, ¶ 11, at 19-20; *see, e.g*., Directive 2053.013, Rules of Conduct, Ex. 1, ¶ 9, Attach. 3, at 3 (Rule A6: Insubordination: "Employees will not refuse to obey, by words or actions, any lawful order of a supervisor.").)  It further means that good order and discipline – establishing, sustaining and enforcing professional standards that set the condition for individual and mission success – is paramount.  (Ex. 1, ¶ 11, at 19 (The Department is "regulated, duty-bound organization that has rules and regulations to perform to a certain standard with certain expectations."); Ex. 2, ¶ 23 ("We cannot have officers doing whatever they want and not hold

2

them accountable.  Like all paramilitary organizations, good order and discipline is critical for setting the conditions for mission success.").)

8.      The Chief of Police is the head of the agency and oversees the entire Department. 2 U.S.C. § 1901; (Ex. 2, ¶ 2; Ex. 1, ¶ 11, at 13.)  As head of the Department, the Chief is statutorily authorized to "appoint, hire, suspend with or without pay, discipline, discharge, and set the terms, conditions, and privileges of employment of employees of the Capitol Police, subject to and in accordance with applicable laws and regulations."  2 U.S.C. § 1907(e)(1)(A). The Chief's ability to terminate employees is expressly limited by statute.  2 U.S.C. § 1907(e)(1)(B).  The Chief must submit all recommendations to terminate USCP employees to the Capitol Police Board ("CPB") for approval. 2 U.S.C. § 1907(e)(1)(B).  No USCP employee may be terminated absent such approval from the CPB.  *Id.*

9.      The CPB is a statutorily created Congressional entity that is comprised of the Sergeant at Arms of the House of Representatives, the Sergeant at Arms of the Senate, and the Architect of the Capitol.  2 U.S.C. § 1901, note (a)(2).  The CPB oversees and supports the USCP in its mission and advances coordination between the USCP and the Sergeants at Arms of the House and Senate and the Congress as a whole.  2 U.S.C. § 1901, note (a)(1).

10.     An Assistant Chief of Police reports to the Chief.  (Ex. 1, ¶ 11, at 13.)  Deputy Chiefs report to the Assistant Chief.  (Ex. 1, ¶ 11, at 13.)  Inspectors, who oversee a division, report to a Deputy Chief.  (*Id*. at 16.)

11.     Nearly 2100 sworn police officers and civilian employees worked for the Department during the time Plaintiff was employed employment.  (Ex. 2, ¶ 2.)

## II.     USCP'S HIRING PROCESS AND TRAINING FOR POLICE OFFICERS

12.     Given the gravity of its mission, the USCP invests significant resources in recruiting the best and brightest talent, and endeavors to retain new recruits.  (Ex. 1, ¶ 9, at 147; Ex. 1, ¶ 11, at 54, 70.)

13.     The recruiting process is extensive.  (Ex. 1, ¶ 3, at 22.)  Persons interested in employment with the Department must submit an applications with supporting materials.  (*Id*. at 20, 24.)

14.     Following this submission, they must endure several rounds of interviews, a physical assessment, drug and polygraph tests, a psychological evaluation, a medical examination, a written examination, and an in-depth background investigation.  (*See* Ex. 1, ¶ 3, at 22-24, 27-29.)

15.     Applicants, who successfully complete the selection process, are appointed as Recruit Officers ("ROs") and assigned to a Recruit Officer Class ("ROC").  (*See* Ex. 1, ¶ 3, at 32; Ex. 1, ¶ 11, at 54.)

16.     At the time of appointment through the date that is one year after a ROs graduation from USCP Academy, an RO is a probationary employee.  (Ex. 1, ¶ 11, at 26; Ex. 1, Directive 2052.004, Probationary Periods, at 4 ("Sworn employees are required to serve a probationary period that begins on the effective date of their appointment to the USCP and ends one year from the date of graduation from the USCP Training Academy.") *Id*. ¶ 9, Attach. 2.)

17.     ROs must complete approximately six months of training at the Federal Law Enforcement Training Center ("FLETC") in Glynco, Georgia (or Artesia, New Mexico) and USCP Academy in Cheltenham, Maryland. (Ex. 1, ¶ 9, at 47-48; Ex. 1, ¶ 11, at 23-25.)

18.     "[W]hen we put together a [recruit] class, it's a big investment in each officer, each employee.  It takes a . . . good amount of time to get them through a background

4

investigation, and when they are hired it's with the hopes and understanding that they remain a full-time employee for [twenty] or [thirty] years for a career.   So when you give up that slot, when you hire somebody for a class of [twenty-four], if we only get 100 seats a year . . . it has an impact when a student fails.  It drives additional duty, and it limits our resources in the field." (Ex. 1, ¶ 11, at 54.)

19.     Generally, ROs attend a one-week orientation at USCP Academy where they are exposed to the rules of conduct, oriented to the Department's chain of command and organizational structure, among other things.  (*Id*. at 23-24.)  ROs are also provided with Directive 2053.013, Rules of Conduct, and with USCP Training Academy Rules.  (*Id*. at 63.)

20.     Class leaders are also selected during the orientation week.  (*See* Ex. 1, ¶ 3, at 39 39.)  Recruit classes have their own rank structure: they are given a president, vice president, and either team or squad leaders.  (Ex. 1, ¶ 11, at 44.)

21.     USCP Training Services Bureau ("TSB") employees at USCP Academy include a lieutenant, approximately six or seven sergeants and ten to fifteen civilian and sworn instructors, including adjuncts.  (Ex. 1, ¶ 11, at 21; Ex. 1, ¶ 9, at 50.)

22.     After their orientation week, ROs are sent to FLETC.  (Ex. 1, ¶ 11 at 23-24.)  At, FLETC, ROs are required to complete the Uniform Police Training Program ("UPTP").  (Ex. 1, ¶ 9, at 48-49; Declaration of Glen Brogan, ¶ 5, Ex. 3.)  "The UPTP is a twelve-week program that provides a study of the basic law enforcement concepts that a new officer should understand and be able to perform upon employment in a federal law enforcement organization."  (Ex. 3, ¶ 5; *see also* Ex. 1, ¶ 9, at 48-49 ("you get a general overview of here's how you do a traffic stop; here's how you handcuff people").)  To become a USCP officer, an RO must receive a certificate of graduation from the UPTP.  (Ex. 3, ¶ 5.)

23.     USCP operations at FLETC are overseen by Lieutenant Glenn Brogan, Commander of the Training Services Bureau ("TSB"), Entry Level Section, FLETC, Glynco Division.  (Ex. 3, ¶ 3.)  In addition to Lieutenant Brogan, the Department's employees at FLETC include Officer Terry Hughes, Officer Dale Carpenter, and Michael Beaver.  (Ex. 3, ¶ 9; *see also* Ex. 1 ¶ 11, at 21.)  Officer Hughes is responsible for training ROs on subjects like use of handcuffs, use of a baton, CPR, first aid, physical conditioning, defensive tactics, and arrest techiniques.  (Ex. 3, ¶ 9.)  Officer Carpenter is responsible for training ROs in the use of handguns and shotguns.  (*Id.*)  Beaver is an administrative assistant who is responsible for registering students for classes, keeping their time and attendance records, and operating the safety cart during physical conditioning classes.  (*Id.*)

24.     While RO's are at FLETC, they are in Lieutenant Brogan's chain of command. (*See* Ex. 3, ¶ 6.)  As such, Lieutenant Brogan establishes guidelines and performance expectations that he communicates to ROs through student evaluations and performance notes ("CP-550s").  (*Id.*)  A CP-550 can be positive, negative, or information in nature.  (Ex. 1, ¶ 11, at 52; Ex. 3, ¶ 6.)

25.     Lieutenant Brogan observes and documents ROs' work performance at roll call, through inspections, during class instruction, and during labs and practical exercises and provides daily feedback through verbal counseling, CP-550s, and inspection reports.  (Ex. 3, ¶ 6.)

26.     Lieutenant Brogan also enforces policies set forth in the FLETC Student Handbook and USCP Training Academy Rules.  (Ex. 3, ¶ 7.)

27.     Once an RO graduates from the UPTP program, she returns to USCP Academy for training.  Ex. 1, ¶ 9, at 48-49; Ex. 1, ¶ 11, at 25.)

28.     At USCP Academy, ROs learn skills, policies, procedures, and laws specific to USCP operations.  (Ex. 1, ¶ 9, at 48-49) (ROs are taught "[USCP] rules, [USCP] procedures, security procedures, processing prisoners in the District of Columbia . . . . [I]t gets really down to the nuts and bolts of what we do as Capitol Police.")

29.     Throughout training at FLETC and USCP Academy, the Department evaluates ROs as to compliance with USCP Training Academy Rules, by academic test scores, as to their efficiency with a handgun and rifle, and as to how they perform in practical scenarios.  (Ex. 1, ¶ 9 at 51-52; Ex. 1, ¶ 11, at 30) (ROs are evaluated via "written exams, demonstration exercises, role playing exercises).

30.     At the end of the approximately six-month period, ROs are ranked.  (Ex. 1, ¶ 9, at 52.)  An RO that has met all the requirements will graduate from USCP Academy.  (*Id*. ¶ 11, at 30.)

31.     Upon graduation from USCP Academy, ROs are administered their oath and formally transition to sworn police officers.  (Ex. 1, ¶ 11, at 26.)

32.     Training is intended to be a learning environment: "They are provided instruction on how to do something.  They are provided information on what to learn.  They are drilled. They are quizzed, and they are given exams.  They are told the standards of which they have to meet.  They are given opportunities to meet those standards."  (*Id*. at 35-36.)

33.     Training is also intended to be extremely rule-oriented and rigidly structured. (Ex. 1, ¶ 9, at 108-109.)  During training, ROs get "constant daily feedback.  That's why there's a lot of documentation on things that people do.  We're trying to get people to conform to the rules so that they follow the rules, because as you go in your career, if you don't follow the rules,

people can get hurt, people can be – you know if you don't follow our rules on use of force . . .
you can take someone's life."  (*Id.*)

34.     The purpose of the training is to "indoctrinate our employees to not only become
law enforcement officers but with the security procedures for the U.S. Capitol."  (Ex. 1, ¶ 9, at
48.)

35.     The training is also intended to provide ROs with "the basic skill set and training
to perform as sworn police officers."  (Ex. 1, ¶ 11, at 29.)

## PLAINTIFF'S HIRING AND TRAINING PERIOD

## I.     PLAINTIFF'S SELECTION

36.     Plaintiff applied to USCP in approximately October 2013.  (Ex. 1, ¶ 3, at 20.)

37.     In January 2014, Plaintiff attended a USCP assessment center.  (*Id.* at 269.)  An
assessment center is a weekend recruiting event the Department holds in which potential recruits
who are interested in becoming police officers would have an opportunity to travel to
Washington, DC, meet with Department officials, and get an overview of the Department's
mission and the role of police officers within the Department.  (Ex. 2, ¶ 5.)

38.     Chief Dine, Assistant Chief Mallow, and Chief Administrative Officer Richard
Braddock attended the assessment center.  (*Id.* ¶ 5.)  Plaintiff had an opportunity to meet Chief
Dine when he was talking to the recruits and ask him questions about the Department.  (Ex. 1, ¶
3, at 257.)  Sourgoutsis recalls that "a lot of the recruits were not really engaging him or asking
questions.  So it was basically like a one-on-one conversation for, like almost over half an hour
with me and the Chief.  I remember asking him about the challenges the Department has, if they
support women coming on, and you know, being in the upper ranks of the Department."  (*Id.*)

39.     Chief Dine also recalls Plaintiff.  (Ex. 2, ¶ 5.)  Chief Dine recalls being impressed
with her outgoing personality, educational background, and interest in the Department.  (*Id.* ¶ 6.)

40.     Plaintiff also recalls meeting Sergeant Kevin Jiannotti, an instructor at USCP Academy.  (Ex. 1, ¶ 3, at 266.)  According to Sourgoutsis, while recruits were being weighed, she handed her water bottle to a sergeant or instructor.  (*Id*. at 265.)  Shortly thereafter, Sergeant Jiannotti pulled her aside and said, "You are under . . . observation here, and you are in the recruiting process to be a police officer . . . [y]ou gave a sergeant of the Capitol Police your  . . . water bottle."  (*Id*. at 266.)

41.     This interaction with Sergeant Jiannotti allegedly made Sourgoutsis feel "heated," insulted, and disrespected.  (Ex. 1, ¶ 3, at 266.)  She recalls thinking, "I'm not some child that needs to be scolded on what to say and how to conduct myself."  (*Id*.)

42.     She further explained, "[W]hat I did or did not do, you know, didn't concern Jiannotti.  And, you know, he felt the need to – to tell me that I had done something that was very, very bad and that he had observed it."  (Ex. 1, ¶ 3, at 270.)

43.     Plaintiff was appointed as an RO to USCP on May 12, 2014 and assigned to ROC 177, a class of twenty-four ROs total.  (*Id*. at 32.)  ROC 177 consisted of eight women including Plaintiff.  (*Id*.)  Plaintiff understood that she was a probationary employee and understood that to mean "there's a time where . . . you're under probation or under perhaps a microscope where they're just seeing, you know, how it's going.  (*Id.* at 31-32.)

## II.     PLAINTIFF REPORTS TO USCP ACADEMY FOR ORIENTATION

44.     Plaintiff arrived at USCP Academy in Cheltenham, MD on Monday, May 12, 2014 for orientation week.  (Ex. 1, ¶ 3, at 43.)

45.     ROC 177's class coordinators was Sergeant James Gupton and Charles Cook.  (*Id*. at 33.)  The class coordinators were responsible for supervising and leading the class.  (*Id*. at 34.)  Sergeant Gupton and Cook reported to Lieutenant Sara Logan.  (*Id*. at 35.)  Lieutenant Logan reported to Inspector Beth Dodgson.  (*Id*.)

46.     In addition to these officials, ROC 177 instructors included Sergeant John Hersch, Sergeant Rhonda Jackson and Sergeant Jiannotti.  (Ex. 1, ¶ 3, at 33-34.)

47.     During the first week, Plaintiff had to attend roll calls at the start of each day. (Ex. 1, ¶ 3, at 37.)  At the roll calls, the Sergeant would "inspect you, make sure that you're where you should be and that you should – you look appropriate and will kind of speak to you about what the day will bring or what's going to happen." (*Id*.)  ROs were required to stand in their assigned spot and they were required to have the flag where it should be. (*Id*.)  The Sergeant would "look you up and down, make sure that all your gear is clean and new and in the right place." (*Id*.)

48.     In addition to assessing their appearance and that they were standing in their assigned spot, the Sergeant also would "make you turn on your flashlight to make sure that it did, in fact, work, that your – your pens – there was two pens at all times, that you had your notepad inside of your . . . shirt . . . . If it was gear, they wanted to make sure that it was fully functional and that you had it on your person when you should." (Ex. 1, ¶ 3, at 40-41.)

49.     Leaders for ROC 177 were chosen by the staff and included: RO Zachary Madera, Class President; RO Amanda Rittmeier, Class Vice President; and squad leaders. (Ex. 1, ¶ 3, at 39.)  Plaintiff's squad leader was RO Solomon Smith. (*Id*. at 40.)

50.     During the first week of orientation, the Sergeants covered Directive 2053.013, Rules of Conduct, as well as USCP Training Academy Rules. (*Id*. at 42.)

51.     Three days after arriving at USCP Academy, Plaintiff incurred her first violation of the USCP Training Academy Rules. (Ex. 3, ¶ 10; Personnel Performance Note, dated May 15, 2014, Ex. 1, ¶ 3, Attach. 1.)  ROs were required to wear a uniform of the day, but Plaintiff had forgotten to bring hers to USCP Academy. (Ex. 1, ¶ 3, at 43.)

52.     When Plaintiff reported this issue to Sergeant Gupton, she told him that she would be happy to go to a nearby big box store and obtain the required uniform.  (Ex. 1, ¶ 3, at 44.)

53.     According to Plaintiff, Sergeant Hersch, interjected into the discussion she was having with Sergeant Gupton and stated to Plaintiff that it was not advisable for her to leave the premises wearing USCP identifiable gear."  (Ex. 1, ¶ 3, at 44, 47.)

54.     Plaintiff told Sergeant Hersch, "I'm very well aware that I'm not going to be leaving the premise with a t-shirt that says who I am and where I am."  (Ex. 1, ¶ 3, at 44.)

55.     According to Plaintiff, Sergeant Hersch made her feel like she did not have bad judgment.  "You know, at the time, I was 28 or 29 years old . . . I think I have excellent judgment actually."  (Ex. 1, ¶ 3, at 47.)

56.     Sergeant Gupton issued a CP-550 documenting Plaintiff's failure to bring her uniform of the day as an Academy Rules violation.  (Ex. 1, ¶ 3, at Attach. 1.)

57.     During the orientation week, Plaintiff recalled having a discussion with RO Smith after he confronted her about a statement she made.  (Ex. 1, ¶ 3, at 202.)  When asked why she joined USCP, Plaintiff stated that she only took the position for the health insurance.  (Sourgoutsis Tr. 202.)  RO Smith was apparently offended by the comment, but Plaintiff insisted it was a joke.  "He knew me a week and it was a joke."  (*Id.*)

## III.    PLAINTIFF ATTENDS FLETC

58.     Plaintiff arrived at FLETC in Glynco, Georgia on Sunday, May 18, 2014.  (Ex. 1, ¶ 3, at 50; *see also* Ex. 3, ¶ 8.)

59.     Plaintiff's chain of command was Officer Hughes and Lieutenant Brogan. (Ex. 1, ¶ 3, at 52.)

60.    At FLETC, training occurred Monday through Friday.  (Ex. 1, ¶ 3, at 52-53.)
ROs were given a schedule upon arrival.  (*Id*.)  Every day was accounted for.  (*Id*.)  There was a
lot of structure in terms of the ROs' time.  (*Id*.)

61.    Plaintiff had group physical exercises approximately three days a week.  (Ex. 1, ¶
3, at 54.)  She had classroom instruction daily.  (*Id*.)  She continued to have daily roll calls,
mainly with Officer Hughes, but sometimes with Lieutenant Brogan.  (*Id*. at 53.)  According to
Plaintiff, the new environment and surroundings was "very intense."  (*Id*. at 52.)

62.    Officer Hughes led the group physical conditioning classes and physical skills
classes, but neither Lieutenant Brogan nor Beaver taught courses.  (Ex. 1, ¶ 3, at 56.)  As a result,
her interactions with Lieutenant Brogan and Beaver were limited.  (*Id*. at 53.)

## IV.    PLAINTIFF'S CONDUCT ISSUES AT FLETC

63.    On June 24, 2014, Lieutenant Brogan and Officer Hughes presented Plaintiff with
a CP-550 dated June 6, 2014, concerning an incident on June 2, 2014.  (Personnel Performance
Note, dated June 6, 2014, Ex. 1, ¶ 3, at Attach. 2.)  On May 20, 2014, Officer Hughes had
instructed the class to set up an account on the American Safety and Health Institute's website
for the purposes of completing online training before June 3, 2014.  (*Id*.)  Officer Hughes
reminded ROC 177 every day between May 27, 2014, and May 30, 2014, to get the training
completed before June 3, 2014, or they would be unable to attend the next portion of the training
and that if anyone was having issues doing so they should bring those issues to him.  (*Id*.; Ex. 1,
¶ 3, at 64)  On June 2, 2014, Officer Hughes learned that all ROs in ROC 177 had completed the
training, but Plaintiff.  (*Id*.)

64.    Officer Hughes met with Plaintiff on June 2, 2014.  (*Id*.)  Plaintiff was locked out
of her account and had attempted to resolve the issue on her own, but was unsuccessful.  (Ex. 1,
¶ 3, at 59, 74-75.)  Plaintiff did not "feel the need" to bring the issue to Officer Hughes although

he specifically instructed the ROs to do so.  (*Id*. at 65.)  During the June 2, 2014, conversation, Officer Hughes let Plaintiff know that it was a problem that she did not bring the issue to his attention earlier.  (*Id*. at 72.)  After speaking with Officer Hughes, Plaintiff was able to resolve the issue and complete the required training by the deadline.  (Ex. 1, ¶ 3, at 60, 69, 71.)

65.     Plaintiff contends the CP-550 should not have been written because, "My communication skills are my communication skills, and he should respect that and be sensitive to that, and not write a [CP-550], which is exactly what he did.  (Ex. 1, ¶ 3, at 77.)

66.     On June 23, 2014, Lieutenant Brogan presented Plaintiff with two CP-550s dated June 20, 2014.  (Personnel Performance Notes, dated June 20, 2014, Ex. 3, at Ex. D, E.)

67.     The first CP-550 was for an Academy Rule uniform violation occurring on June 20, 2014 when Plaintiff wore purple socks with her uniform.  (Ex. 1, ¶ 3, at 124.)  When Lieutenant Brogan asked her about the socks, Plaintiff responded "Purple Fridays."  (Ex. 1, ¶ 3, at 126; Ex. 3, ¶ 17.)  Lieutenant Brogan had noticed that Plaintiff wore purple socks the previous Friday, July 13, 2014, but he did not get an opportunity to address the issue with her then.  (*Id*. ¶ 16.)  Plaintiff contends that she said "purple Friday" in response to Lieutenant Brogan's inquiry in jest.  (Ex. 1, ¶ 3, at 126.)  When Plaintiff responded, "Purple Fridays in response to his question, Lieutenant Brogan was surprised he interpreted her response as she was not taking the issue seriously.  (Ex. 3, ¶ 17.)

68.     Lieutenant Brogan told Plaintiff that he saw her wearing the socks in roll call. (Ex. 1, ¶ 3, at 128.)  Lieutenant Brogan counseled Plaintiff about the uniform requirements, the Academy Rules, and told her it was the wrong color.  (*Id*. at 126.)  Plaintiff concedes the CP-550 is an accurate depiction of what occurred.  (Ex. 1, ¶ 3, at 128.)

69.  The second CP-550 issued dated June 20, 2014, concerned an issue Plaintiff raised with Lieutenant Brogan in which she told him that students from other agencies were drinking in the pool outside her window, making it difficult for her to sleep.  (Ex. 1, ¶ 3, at 130.) Plaintiff said to Lieutenant Brogan that she "[d]idn't want to go turbo bitch on them, you know, New York style."  (Ex. 1, ¶ 3, at 130.)  Lieutenant Brogan found this statement highly unprofessional as ROs typically do not address the chain of command in this manner.  (Ex. 3, ¶ 19.)  Lieutenant Brogan offered various ways to remedy the situation and advised her that her initial instinct to confront the other students in the matter she described would have been wrong and in violation of the Departments rules.  (Ex. 3, ¶ 18; *see also* Ex. 3, at Ex. D.)  Lieutenant Brogan documented the discussion and counseling on a CP-550, but indicated that the CP-550 was not an Academy Rules violation.  (*Id*.; Ex. 1, ¶ 3, at 134-35.)

70.  On June 24, 2014, Lieutenant Brogan presented Plaintiff with a CP-550 dated June 23, 2014 concerning a violation of FLETC's Privacy Act and Operations Security Practices. (Personnel Performance Note dated June 23, 2014, Ex. 3, at Ex. F, at 1.)  According to Plaintiff, she received the CP-550 because "I was using my cell phone in the cafeteria."  (Ex. 1, ¶ 3, at 143.)  She eventually conceded that she understood that the CP-550 was about her use of the cellphone camera, including video, in the cafeteria.  (*Id.* at 145-46.)  Specifically, Plaintiff admitted that she was Skyping or FaceTiming with her then fiancé, now husband, in the cafeteria, that she wanted to show him her uniform, and that she panned her camera around the cafeteria to show him what a fellow RO was wearing.  (*Id*. at 147.)  On another occasion, Plaintiff was again caught Skyping or FaceTiming in the cafeteria.  (*Id*.)  The June 23, 2014 CP-550 concerns this second incident.  (*Id*. at 152.)

14

71.     Before this second incident, Plaintiff's class leaders, RO Madeira and RO Rittmeier, counseled her about her inappropriate cell phone activity.  (Ex. 1, ¶ 3, at 167 ("I remember them addressing the FaceTime . . . I apologized that I did the FaceTime.").)  At this meeting, RO Madeira told her that, if there were further incidents, he would let Lieutenant Brogan know.  (Ex. 1, ¶ 3, at 173.) Lieutenant Brogan asked class leaders RO Madeira and RO Smith to document the cellphone issue and other complaints they received about Plaintiff and provide a memorandum explaining how it was addressed.  (Ex. 3, ¶ 15 and Ex. C.)

72.     Despite her classmates counseling, Plaintiff did it again on June 23, 2014, which generated the June 23, 2014, CP-550.  (*See* Ex. 3, ¶ 24 and Ex. F, at 1.)  Lieutenant Brogan told her that Skyping or FaceTiming was the issue.  (Ex. 1, ¶ 3, at 146.)  When Lieutenant Brogan presented the CP-550, he counseled Plaintiff about other places on FLETC grounds where she could Skype without violating the FLETC Student Handbook policy.  (Ex. 2, ¶ 24; Ex. 1, ¶ 3, at 252.)  For example, he told her she could text in the hallway or outside during a break.  (Ex. 1, ¶ 3, at 162.)  Also Lieutenant Brogan made it a point to say, "We don't want you to go [ten] hours a day without contacting your loved ones."  (Ex. 1, ¶ 3, at 162; *see also* Ex. 3, at Ex. F.)

73.     On June 24, 2014, Lieutenant Brogan and Officer Hughes presented Plaintiff with a CP-550 related to an incident occurring on June 19, 2014, when Plaintiff was overheard allegedly referring to other ROs as "asshole."  (Personnel Performance Note, dated June 24, 2014, Ex. 3, at Ex. H; Ex. 1, ¶ 3, at 176.)  On June 19, 2014, Plaintiff was talking to RO Terrance Laster in what she believed to be a private conversation, but there was a microphone in the room that transmitted what she said to the instructor and other ROs in the adjoining room.  (Ex. 1, ¶ 3, at 180-81.)  Sourgoutsis told Lieutenant Brogan that she did not recall who she was referring to when she said asshole, but she did not believe it was a classmate.  (Ex. 1, ¶ 3, at 181.)

Lieutenant Brogan collected witness statements from the class and RO Laster's statement indication that Plaintiff was talking about two classmates.  (Ex. 1, ¶ 3, at 204-05.)  No dispute exists that she said "asshole" and that her classmates and instructor heard it.  (*Id.*)

74.     Plaintiff apologized to RO Brady Speth, who told her he believed that she made the comment about him.  (Ex. 1, ¶ 3, at 179, 215.)  Plaintiff told RO Speth that she was not talking about him.  (*Id*. at 179.)

75.     Lieutenant Brogan told her that she was on disciplinary probation after the profanity incident because she had three Academy Rule violations.  (Ex. 1, ¶ 3, at 230.)  Plaintiff understood that if she received five violations she would be terminated by the Department.  (*Id.* at 230-31.)

76.     On July 3, 2014, Officer Hughes and Lieutenant Brogan presented Plaintiff with a CP-550 concerning an incident on June 26, 2014, when she was so late to the class photo that the picture had been taken by the time she arrived.  (Personnel Performance Note dated June 26, 2014, Personal Performance Note, Ex. 3, at Ex. J, at 1; Ex. 1, ¶ 3, at 222, 224.)  Officer Hughes and Lieutenant Brogan counseled Plaintiff for not responding to an assignment in a timely manner.  (*Id*. at 224.)

77.     Once the class arrived for the photograph, Plaintiff went to the bathroom.  (Ex. 1, ¶ 3, at 222.)  By the time she exited the bathroom and caught up with the class the photo had been taken.  (*Id*.)  Plaintiff apologized to the photographer who took more photographs once Plaintiff joined the group.  (*Id*. at 224.)  Beaver observed that Sourgoutsis was late and had exited the bathroom with a bag with a make-up brush sticking out of it.  (*Id*. at 113-14.)

78.     ROC 177 left FLETC on August 11, 2014.  (Ex. 3, ¶ 8; Ex. 1, ¶ 3, at 232.)

Plaintiff had no further contact with Lieutenant Brogan, Officer Hughes, or Beaver after leaving

FLETC in August 2014.  (Ex. 1, ¶ 3, at 232; Ex. 3, ¶ 35.)

## V.     ALLEGED DISCRIMINATION AND HARASSMENT AT FLETC

79.     Plaintiff alleges that following conduct by Officer Hughes and/or Lieutenant

Brogan is unlawful harassment or discrimination:

80.     Officer Hughes or Lieutenant Brogan requiring Plaintiff to write memoranda as to

academic issues or performance/conduct issues.  (Ex. 1, ¶ 3, at 81.)  Plaintiff estimates she wrote

about seven to nine such memoranda.  (Ex. 1, ¶ 3, at 84.)  As a general practice, Lieutenant

Brogan requires students to provide written memoranda concerning CP-550s and other incidents

because this exercise helps ROs develop skills that they will be required to use in the line of duty

as police officers.  (Ex. 3, ¶ 31.)

81.     Officer Hughes or Lieutenant Brogan giving her CP-550's.  (Ex. 1, ¶ 3, at 82.)

According to Plaintiff, this conduct made her feel like Officer Hughes and Lieutenant Brogan

were attacking her.  (*Id*.)  Plaintiff contends that this conduct was discriminatory because male

ROs engaged in similar conduct and did not receive CP-550s.  (Ex. 1, ¶ 3, at 87.)  Plaintiff

alleges that Officer Hughes and Lieutenant Brogan singled her out for documentation and

discriminated against her because she is "a very strong female, hardworking and educated.  And

I don't really think that there are too many of me."  (Ex. 1, ¶ 3, at Tr. 262.)  Likewise, Plaintiff

believes Officer Hughes and Lieutenant Brogan harassed her because "like I said before, strong,

educated, hard-working female officer.  I don't fit their mold . . . . "[T]hey're not comfortable

with a female like me, or they don't know what to do with me."  (*Id*. at 281.)  Plaintiff also

believed that "I don't think they want people . . . that are smart that will . . . cut through their –

their flawed logic."  (*Id*. at 292.)  Plaintiff also believed that she was harassed and discriminated

against because of her education because "[i]f you take into consideration that a lot of them have, like, an associates or haven't been to college, or haven't been outside of their natural environment to see the outside world – to – to receive an education, that is – that is broad, that opens up their eyes.  I mean, maybe they were intimidated by it."  (Ex. 1, ¶ 3, at 292-93.)

82.    Specifically Plaintiff contends that male ROs were permitted to use their cell phones though she was not.  (*Id*. at 91.)

83.    Plaintiff also contends that a male RO said to a classmate in front of everyone in the context of a physical competition that "I'm going to rock your ass," and that he was not written up.  (Ex. 1, ¶ 3, at 87.)  The male RO who said "I'm going to rock your ass," was written up by Lieutenant Brogan.  (Ex. 3, ¶ 31; Ex. 3, Ex. K.)

84.    During her June 20, 2014, discussion with Lieutenant Brogan concerning the purple socks and the issue with other agencies congregating outside her window, Lieutenant Brogan asked her why she was at USCP and/or why she took the position.  (Ex. 1, ¶ 3, at 131-132, 139.)  After Plaintiff responded that she was at USCP because she wanted a career in law enforcement, Lieutenant Brogan told her that he knew since he was a child that being a police officer was his calling.  (Ex. 1, ¶ 3, at 131-32.)  Plaintiff says this discussion "made me feel like I didn't belong there, that because of, you know, wearing a wrong color sock one time or because I had joked about going New York on them, that, you know this really was not the environment for me."  (*Id*. at 132.)  Lieutenant Brogan never said, "You don't belong here."  (*Id*. at 133.)

85.    On June 24, 2014 when presenting her with the discipline concerning the June 19, 2014 incident in which she used the term "asshole," Officer Hughes allegedly said, "[Y]ou're the type of officer that will show up to work late and push me to go home late to go see my family." (Ex. 1, ¶ 3, at 83.)  Lieutenant Brogan also pushed her to admit who she was referring to as an

"asshole." (*Id*. at 276.)  The meeting allegedly lasted about forty-five minutes to one hour, and she was also instructed not to talk to anyone about the incident. (*Id*. at 83, 276.)

86.     Lieutenant Brogan gathering witness statements from Plaintiff's classmates regarding her conduct. (Ex. 1, ¶ 3, at 123-24.)  "I think a department that calls in your classmates to write statements about what they heard you say or didn't say, again, that's them going, like, above and beyond to make my work environment hostile." (*Id*.)  "Everything is, like, hearsay, or let's talk to this person, or – you know, you're not regarded as a grown, professional person." (*Id*.)  Plaintiff further alleges that the Department slandered and attacked her name by allowing her classmates to write mean things about her. (*Id*. at 217.)  Plaintiff further contends that the Department never asks for witnesses statement except during a sexual harassment investigation. (Ex. 1, ¶ 3, at 220.)  To Plaintiff's knowledge, the Department asked her classmates as it relates to the June 19, 2014, profanity incident to write about what they witnessed. (*Id*. at 217.)  Lieutenant Brogan regularly gathers witness statements from members of recruit classes, and in particular class leaders, about incidents that they witness that Lieutenant Brogan and his staff are not present to observe. (Ex. 3, ¶ 34.)  For example, Lieutenant Brogan asked class leaders and witnesses in another ROC when, in response to a ROs answer to an instructor, another RO "fake coughed" and said "bullshit" under his breath. (*Id*.)

87.     Officer Hughes on one occasion allegedly said to her, "I'm not talking to you," after she answered a question he asked. (Ex. 1, ¶ 3, at 85.)

88.     Officer Hughes allegedly kicked her out of physical conditioning class once or twice for no reason, had her wait outside, and then ask "[I]s everything – everything okay, or you know, what's going on or something." (Ex. 1, ¶ 3, at 89.)

89.     Once when they were running, Officer Hughes allegedly asked, "Is there a reason why you're not running – why you're running so slow," and when she gave a response he did not like he told Plaintiff to shut her mouth or he would put her in the cart with Beaver. (Ex. 1, ¶ 3, at 90.)

90.     Before the Fourth of July weekend in 2014, Officer Hughes kept her after class to "lecture" her on some matter. (Ex. 1, ¶ 3, at 112.)

91.     The day after she missed the class picture, Officer Hughes pulled her aside and asked her to explain what happened with the class picture and what she had been doing in the bathroom. (Ex. 1, ¶ 3, at 113-14.) Specifically, Officer Hughes wanted to know whether she had been putting on make-up. (Ex. 1, ¶ 3, at 113-14, 224.) Plaintiff contends that she was embarrassed by this incident: "I mean asking a grown human being what they were doing in the bathroom in front of Mr. Beaver, in front of other students, was embarrassing." (Ex. 1, ¶ 3, at 113-14.)

92.     Officer Hughes would single her out and separate her from the class to "lecture" her. (Ex. 1, ¶ 3, at 116-17.) On the one hand Plaintiff was embarrassed when others overheard the conversation, one the other hand Plaintiff did not want to be separated because "for a lot of these things, I didn't have a witness." (*Id*. at 116.)

93.     Neither Officer Hughes nor Lieutenant Brogan checked on her when she went to the infirmary as they had done for other female ROs. (Ex. 1, ¶ 3, at 92.) Lieutenant Brogan checked on her after she left the infirmary, but not that same day. (*Id*. at 94-95.) Plaintiff alleges that Lieutenant Brogan told her it was the Department's process to make sure that people are okay and to either escort them to the medical unit or check up on them there, but they could not do it in her case. (*Id*. at 102.)

## VI.   PLAINTIFF'S MISCONDUCT CONDUCT AT USCP ACADEMY

94.     On August 22, 2014, Sergeant Hersch issued Plaintiff a CP-550 for chewing gum in class on August 21, 2014, in violation of Academy Rules.  (Personnel Performance Note, dated Aug. 22, 2014, Ex. 1, ¶ 3, at Ex. 3.)  Plaintiff admits that she was chewing gum in violation of the rules.  (Ex. 1, ¶ 3, at 237.)

95.     On September 23, 2014, Sergeant Gupton issued Plaintiff a CP-550 for conduct occurring during a role playing exercise on September 17, 2014, in violation of the Academy Rules concerning courtesy.  (Personnel Performance Note, dated Sept. 23, 2014, Ex. 1, ¶ 3, at Ex. 4, at 1.)  Plaintiff was working with another RO and being observed by an instructor when a role player presented herself to be screened.  (Ex. 1, ¶ 3, at 239-40.)  The role player began saying things that indicated she was a "mental observation."  (*Id*. at 239-40.)  Plaintiff placed a bowl over her mouth and said to the other RO this lady is MO, "[s]he's crazy."  (Ex. 1, ¶ 3, at 239-40.)  This CP-550 was counted as her fourth violation.  (*See*, Ex. 1, ¶ 3, at Ex. 4, at 1.)

96.     Despite Plaintiff knowing that the Department's challenge is ensuring the safety and security of people who visit and work on the Capitol Complex and that USCP officers are required to be courteous to all visitors, Plaintiff insists that in calling the role player crazy "I didn't do anything that I was not trained to do."  (Ex. 1, ¶ 3, at 241, 246.)

## VII.   PLAINTIFF GRADUATES TRAINING AND BECOMES A SWORN POLICE OFFICER

97.     On November 14, 2014, Plaintiff graduated with ROC 177.  (Ex. 1, ¶ 3, at 256.) Following graduation from USCP Academy, Plaintiff had no further contact with Sergeant Hersch or Sergeant Jiannotti.  (Ex. 1, ¶ 3, at 259.)

98.     Following graduation, Plaintiff was placed in the Field Training Officer ("FTO") program and paired with a veteran officer who was to work with her for four weeks and show her

what working on Capitol Hill was like.  (Ex. 1, ¶ 3, at 298-99.)  Plaintiff's FTO completed daily observation reports documenting Plaintiff's growth as an officer.  (*Id*. at 300.)

99.     Plaintiff was then assigned to the Capitol Division, Uniformed Services Bureau ("USB"), shift three ("CD-3").

100.    USB is where the majority of officers graduating from USCP Academy are assigned.  (Ex. 1, ¶ 9, at 121.)  About 1200 officers and officials work in USB.  (*Id*.)

101.    The Capitol Division is the Division responsible for safeguarding the U.S. Capitol and the Capitol Visitor Center ("CVC").  (Ex. 1, ¶ 11, at 16.)  At the time Plaintiff was assigned there, Inspector Waldow was the Division Commander.  (*Id*. at 12, 15.)  Inspector Waldow had very little interaction with Plaintiff when she was assigned to the Capitol Division.  (*Id*. at 130-31.)

102.    Inspector Waldow reported to Deputy Chief Chad Thomas, then Commander of USB.  (Ex. 1, ¶ 11, at 16, 139.)  Deputy Chief Thomas had very little interaction with Plaintiff when she was assigned to the Capitol Division.  (Ex. 1, ¶ 8, at 18.)   Deputy Chief Thomas became aware of Plaintiff only when she received discipline on two separate occasions within her probationary period.  (*Id*. at 15.)

103.    The chain of command for CD-3 during the majority of Plaintiff's tenure was as follows: Sergeant Tyrone Vias, Sergeant Joseph Moroziewicki, and Sergeant Maria Willis were the first-line supervisors; and Lieutenant James Leonard was the Section Commander; Captain Yogananda Pittman, Captain Andrew Bolinger, and Captain Sean Gallagher were the Assistant Division Commanders.  (Ex. 1, ¶ 11, at 123-24, 133, 145.)

104.    Sergeant Willis became Plaintiff's Squad Leader around January 2014.  (Ex. 1, ¶ 12, at 14.)

## VIII.   PLAINTIFF'S MISCONDUCT IN THE CAPITOL DIVISION

105.    On June 2, 2015, Plaintiff was issued a Command Discipline Report ("CP-534")

with a written warning by Captain Bolinger for a violation of Directive 2053.013, Rules of

Conduct, Rule B2: Personal Appearance occurring on May 10, 2015, when she was observed on

duty not wearing her uniform shirt.  (Declaration of Danny McElroy, Ex. 4, at Ex. B.)

106.    "I was not wearing the appropriate uniform that was issued to me.  I had been

working in the Capitol Dome trailer where they screen employees that are working on the . . .

restoration project."  (Ex. 1, ¶ 3, at 319.)  Sergeant Danny McElroy, a first-line supervisor

assigned to Capitol Division, shift one ("CD-1"), received a call from a sergeant in

communications at about 5:25 a.m. who told him that an officer in the Capitol Dome trailer was

not wearing a uniform and was screening individuals as they entered the facility.  (Ex. 4, ¶ 5.)

Sergeant McElroy reported to the trailer and observed Plaintiff not wearing her uniform shirt,

badge, or any other insignia identifying her as a USCP officer.  (Ex. 4, ¶ 6; Ex. 1, ¶ 3, at 319 ("I

was not wearing [] my outer shirt with my USCP logo.  So I was not identifiable to the public,

which I understand.").)

107.    Sergeant McElroy instructed Plaintiff to go to the bathroom and put on her

uniform and Plaintiff complied with that instruction.  (Ex. 4, ¶ 8.)  Sergeant McElroy then

counseled Plaintiff about wearing the appropriate uniform.  (Ex. 4, ¶ 8; Ex. 1, ¶ 3 at 319.)

108.    When Sergeant McElroy reported it to his chain of command, he was told by

Lieutenant Sebo to draft a CP-534, which he did.  (Ex. 4, ¶ 12.)  Sergeant McElroy had never

seen a uniformed officer on the Department working at their post without their uniform shirt.

(Ex. 4, ¶ 14.)  Sergeant McElroy also had never observed an officer working in the Dome trailer

not in uniform before or after May 10, 2015.  (*Id.*)  Plaintiff had no negative interactions with

Sergeant McElroy before this incident on May 10, 2015.  (Ex. 1, ¶ 3, at 354.)

109.    On June 2, 2015, Plaintiff was issued a second CP-534 with a penalty of sixteen

hours leave forfeited for violation of Directive 2053.013, Rules of Conduct, Rule B10: Neglect

of Duty occurring on May 11, 2015.  (Declaration of Joseph Moroziewicki, Ex. 5, at Ex. D.)  On

May 11, 2015 at approximately 4:30 p.m. a radio call went out for an FRU supervisor to respond

to the unit number of an officer located on the center plaza, east front of the U.S. Capitol.  (Ex. 5,

¶ 4.)  Sergeant Moroziewicki responded to the call sometime between 4:30 and 4:45 p.m.  (*Id.*)

Upon arrival, he was met by an officer who told him that Plaintiff was creating an unsafe

condition.  (*Id.*)

110.    Plaintiff was assigned at an unsecured, egress door right outside the CVC.  (Ex. 1,

¶ 3, at 338.)  Architect of the Capitol ("AOC") employees were doing work on the door and it

was open.  (*Id.*)  While Plaintiff was supposed to securing the door, she sat down on a garden

retaining wall and engaged in a conversation with an AOC worker who was also sitting on a

wall.  (*Id.* at 341, 345.)  The officer who had called for a supervisor snapped a picture of Plaintiff

sitting on the wall.  (Ex. 1, ¶ 3, at 348; Ex. 5, ¶ 4; Ex. 5, at Ex. A.)

111.    In the photograph, Plaintiff is sitting casually on a planter bed wall with her legs

crossed and arms around her legs.  She is talking to someone who is not a police officer and her

back is to the door she should be securing.  In this position, Plaintiff would not be able to take

action if a person approached her from the side.  (Ex. 5, ¶ 6.) The location of the door is in a high

traffic area, which is the point of access to all visitors to the CVC.  (*Id.* ¶ 7.)  This means that one

of the first things visitors to the CVC would see when entering or exiting the facility was

Plaintiff sitting casually on a planter bed wall.  (Ex. 5, ¶ 7.)

112.    When Sergeant Moroziewicki arrived on the scene Plaintiff was still at her post, standing, and being attentive.  (Ex. 5, ¶ 5.)  For this reason, he did not need to address Plaintiff at that time.  (*Id.*)

113.    Plaintiff does not dispute that she was sitting on a wall.  (Ex. 1, ¶ 3, at 346.)  Plaintiff further does not dispute that she was conversing with an AOC worker.  (*Id.*)  Plaintiff further does not dispute that she placed a call on her cell phone while at the post, although this information does not appear in the CP-534.  (*Id.*)  Plaintiff alleges that the Sergeant, and not her, was in the wrong for failing to correct her if she was doing something wrong and that the Sergeant should have been disciplined for failing to supervise.  (*Id.* at 348.)  Before this incident, Plaintiff had no negative interactions with Sergeant Moroziewicki.  (*Id.* at 352-53.)

114.    Sergeant Moroziewicki and Sergeant Willis interviewed Plaintiff about the incident and required her to provide written answers to their questions.  (Ex. 5, ¶ 11; *see also* Ex. 5, at Ex. C.)

115.    During the meeting with Captain Bolinger, Plaintiff was represented by a union representative.  (Ex. 1, ¶ 3, at 387.)  The meeting was less than an hour in length.  (*Id.* at 388.)  Plaintiff alleges that during the meeting Captain Bolinger said, "[Your] work performance fails to meet their expectations at the Capitol."  (*Id.* at 389.)  Captain Bolinger also allegedly said Plaintiff had a history of this.  (*Id.*)  Captain Bolinger further said, "[Y]ou just don't get it.  I don't think you get it."  (*Id.* at 394.)  Captain Bolinger did not curse or yell.  (*Id.* at 390.)  Plaintiff nonetheless felt that Captain Bolinger was attacking her because "[H]e and I are actually in the same age bracket, but he's speaking to me like I'm – like I'm a child."  (Ex. 1, ¶ 3, at 396.)

116.    Before this meeting the only interaction Plaintiff had with Captain Bolinger was when they exchanged greetings.  (*Id.* at 403.)  Plaintiff had no further interaction with Captain Bolinger after the meeting.  (*Id.*)

117.    Plaintiff also received a CP-550 for failing to follow the rules of parking on Capitol Hill.  (Ex. 1, ¶ 11, at 188.)  Inspector Waldow explained that this was an issue to be documented because "parking is not . . .  something that the officer is entitled to.  [I]t's a courtesy provided by the Sergeant at Arms office, and it's important that we don't take advantage of that."  (*Id.* at 188.)

## IX.    PLAINTIFF APPEALS DISCIPLINE CONCERNING NEGLECT OF DUTY

118.    Plaintiff, with the help of Jim Konczos, then Chairman of the union, and Gus Papathanasiou, then Vice Chairman of the union, appealed the CP-534 concerning a violation of Directive 2053.013, Rules of Conduct, Rule B10: Neglect of Duty to then Assistant Chief of Police, now Chief of Police, Verderosa.  (Ex. 1, ¶ 3, at 404.)  As part of the appeal, Plaintiff and her representatives met with Chief Verderosa to discuss the matter.  (*Id.* at 408.)  At this meeting, Chief Verderosa's sole responsibility was to adjudicate the discipline – i.e., "determine whether the or not the violation occurred and if it violated our rules."  (Ex. 1, ¶ 9, at 94-95.)

119.    During the meeting Chief Verderosa conveyed to Plaintiff that based on the "observation and the conversation and the length of time and just the tactical position she was in she could have created a situation where a breach could have occurred.  She's sitting on a wall, very casual, not looking at the door specifically."  (Ex. 1, ¶ 9, at 101.)  "It's sitting on a wall and being relaxed and not being attentive to that door is not a tactically sound position.  We would never have taught that.  We would never condone it."  (*Id.* at 159-60.)

120.    Following this conversation, Sourgoutsis made a comment on her way out the door to the effect that she felt like she was being like a child or a kindergartner, which Chief

Verderosa's assistant, Helen McGroarty overhead, told Chief Verderosa, and documented in a memorandum.  (Ex. 6, ¶ 6; *see also* Ex. 6, at Ex. A.)  Sergeant Moroziewicki and Sergeant Willis interviewed Plaintiff about the incident and required her to provide written answers to their questions.  (Ex. 5, ¶ 11; *see also* Ex. 5, at Ex. C.)

## X.      PLAINTIFF'S TERMINATION

121.    Inspector Waldow determined to recommend Plaintiff for termination because he "believe[d] her actions created an accurate picture of her ability to perform in the manner[ ] expected and to demonstrate the appropriate standards."  (Ex. 1, ¶ 11, at 165.)  In mid-July, Inspector Waldow spoke with Cynthia Miles, Office of Human Resources Specialist, about Plaintiff's work history and the steps that would need to be accomplished to terminate her.  (*Id*. at 168.)

122.    Inspector Waldow requested feedback from his chain of command regarding Plaintiff's performance, but does not recall getting any feedback that overcame the seriousness of the neglect of duty violation in particular.  (Ex. 1, ¶ 11, at 198.)

123.    Inspector Waldow ordered Captain Bolinger to contact Miles around July 20, 2015, to determine what supporting documents he would need for a termination.  (Ex. 1, ¶ 4, at 168-69.)  Miles provided Captain Bolinger with a sample memorandum of what would be required for termination.  (*Id*. at 171.)

124.    Captain Bolinger emailed Lieutenant Leonard on July 23, 2015, to determine how much information such as rating reports, FTO reports, discipline, and CP-550 the division had to support Plaintiff's termination.  (*Id*. at 172.)  Captain Bolinger had no other role in the termination beyond this.  (*Id.* at 132-33, 135.)

125.    Inspector Waldow, through his Lieutenant, asked first-line supervisors for input into the termination.  (Ex. 1, ¶ 12, at 63; *see also* Ex. 1, ¶ 12, at Ex. 1.) Sergeant Willis elected not to provide input.  (*Id*.)

126.    Inspector Waldow drafted the recommendation to terminate Plaintiff.  (Waldow Decl. 9; Termination Recommendation (Declaration of Eric Waldow, Ex. 7.)  Inspector Waldow's termination recommendation memorandum describes in detail all infractions Plaintiff received during her probationary period, including the details of the seven CP-550s she received as an RO, the two CP-534s and CP-550 she received as a sworn officer.  (Ex. 7, ¶ 7.)  Inspector Waldow's termination recommendation memorandum also sets forth the basis underlying the recommendation.  (Ex. 7, at Ex. B.)  The reason Inspector Waldow wrote the recommendation is that Deputy Chief Thomas forwarded an August 14, 2015, memorandum to me on August 28, 2015, from (then) Assistant Chief of Police Matthew Verderosa inquiring about Plaintiff's probationary period evaluations and whether a final evaluation had been completed.  (Ex. 7, ¶ 9.) The August 14, 2015, memorandum from Assistant Chief Verderosa also advised the Division to look at whether to extend or retain Plaintiff based on her record.  (*Id*. 9.) The instruction I received from Deputy Chief Thomas was to get the final evaluation completed and to make a determination as to whether or not to retain or extend Plaintiff's probationary period. Deputy Chief Thomas directed that I respond by September 4, 2015.  (*Id*.)

127.    Inspector Waldow determined to complete Plaintiff's final evaluation and the termination recommendation myself because time was of the essence, since he had to get a response to Deputy Chief Thomas and Assistant Chief Verderosa.  (Ex. 7, ¶ 10.)  The basis for Plaintiff's termination was an overall pattern or practice of noncompliance with Department rules and policies.  (*Id*.) Although field supervisors have oversight over the day-to-day

performance of an individual officer, they generally would not have insight as to the big picture concerns Plaintiff's ongoing noncompliance with rules raised.  (*Id.*)

128.    Deputy Chief Thomas concurred in the Inspector Waldow's recommendation and drafted a memorandum to that effect on October 26, 2015.  (Ex. 1, ¶ 8, at 26-28.)  Deputy Chief Thomas' October 26, 2015, memorandum to then Assistant Chief Verderosa explains the reasons he recommended termination as to Plaintiff.  (Ex. 1, ¶ 8, at Ex. 1.) Deputy Chief Thomas reviewed Plaintiff's personnel file, including discipline, performance notes, the FTO daily observation reports in the course of considering Inspector Waldow's recommendation.  (Ex. 1, ¶ 8, at 26.)

129.    Deputy Chief Thomas determined termination was appropriate as to Plaintiff because "[Plaintiff's recommendation came about as a result of the conduct during her probationary period, because she displayed a pattern of not conforming to the Department's policies and procedures from the time that she was in probation in her field training all the way back to the time that she was in the academy."  (*Id*. at 39.)  Further, from Deputy Chief Thomas's perspective, Plaintiff's pattern appeared to be escalating.  (*Id*. at 39-40.)

130.    Chief Verderosa approved the recommendation.  (Ex. 1, ¶ 9, at 135.)  Chief Verderosa explained why he concurred in Deputy Chief Thomas' recommendation as follows:

> [I]t's in essence the totality of the factors based on her, not only the discipline but all the other issues she had going back to her first days in the Academy.  So it was a totality of that, and I think the specific, the probably the main reason is that she met unsatisfactory performance based on two disciplines, but I think the other factors played very heavily, her other counselings and issues that were documented in those 550s and in all of the jacket, the personnel folder.

(Ex. 1, ¶ 9, at 142.)

131.    Chief Dine also approved the termination after questioning both Chief Verderosa and Deputy Chief Thomas.  (Ex. 2, ¶ 9.)  Chief Dine also approved the termination after

questioning both Chief Verderosa and Deputy Chief Thomas.  (Ex. 2, ¶ 13.)  After completing

his own review of Plaintiff's jacket and central file, Chief Dine approved the termination for the

following reasons: First, although Plaintiff Sourgoutsis sometimes admitted to wrongdoing, she

often made excuses for her actions and blamed others for the choices she made.  For example, as

to the CP-534 she received for neglect of duty, Plaintiff Sourgoutsis shifted some of the blame

for her behavior to the Sergeant who assigned her to that post.  An inability or unwillingness to

take full responsibility for her actions was a major concern for me.  (Ex. 2, ¶ 14.)

132.     Second, the incident concerning her being in neglect of duty particularly

concerned me.  It appeared that Plaintiff Sourgoutsis did not fully understand the severity of the

issue.  She was the sole officer assigned to an unsecured, high traffic, exterior access point.  She

was not being attentive to her post.  This situation easily could have placed Plaintiff Sourgoutsis

or persons inside the CVC in harm's way.  Moreover, the Department is a security based law

enforcement agency.  Securing access points to the Capitol grounds is not a collateral duty — it

is the essence of the Department's mission.  (Ex. 2, ¶ 15.)

133.     Finally, Plaintiff Sourgoutsis was a probationary employee who received two CP-

534s during her probationary period and had been cited for multiple infractions while at the

Police Academy.  The purpose of the probationary status is to determine whether the employee

and the Department are a good fit in a quasi-military, security policing environment.   Based on

her record, it appeared that Plaintiff Sourgoutsis was not a good fit for the Department in this

type of quasi-military, security policing environment which is strictly structured and

accountability is paramount.   (Ex. 2, ¶ 16.)

134.    Plaintiff was placed on administrative leave pending her appeal of the termination and given a letter from the Director of OHR explaining the basis of the termination.  (Ex. 1, ¶ 8, at 46; Ex. 1, ¶ 3, at Ex. 5.)  Plaintiff's appeal was denied.  (Ex. 2, ¶, 20 and Ex. B.)

135.    Chief Dine recommended Plaintiff Termination to CPB in a memorandum that was approved by all three members of the Board.  (Ex. 2, ¶ 21 and Ex. C.)

## XI.    ALLEGED SEXUAL HARASSMENT OF PLAINTIFF AND OPR INTERVIEW

136.    The Office of Professional Responsibility ("OPR") investigates workplace misconduct, including discrimination, retaliation, and harassment complaints.  (Ex. 1, ¶ 7, at 33.)

137.    On July 27, 2015, OPR received an anonymous complaint alleging that the Respondent, a Department official.  (*Id*. at 84, 118.)

138.    Sergeant Shutter contacted Sergeant Willis to arrange interview with Plaintiff and approximately fifteen other officers.  (*Id*. at 87.)

139.    Sergeant Willis personally arranged all of the interviews.  (Ex. 1, ¶ 12, at 51-52.)

140.    Sergeant Shutters did not notify Respondent's Commander or Respondent that an investigation was occurring until two months after the investigation was initiated.  (Declaration of Mark Shutters, ¶ 4, Ex. 9.)

141.    At the time she was contacted by OPR, Sergeant Willis had no knowledge as to the subject matter of the investigation and did not learn of the subject matter until she was also interviewed in connection with the investigation.  (Ex. 1, ¶ 12, at 51.)

142.    Upon learning the subject matter of the investigation, Sergeant Willis did not disclose this information to anyone.  (Declaration of Maria Willis, ¶ 10, Ex. 8.)

143.    On August 27, 2015, Inspector Herrle, the Commander of OPR, informed Inspector Waldow that OPR received a complaint that Respondent was calling officers "chica." (Ex. 7, ¶ 11; Ex. 1, ¶ 11, at 174.)  Inspector Herrle did not provide Inspector Waldow with any

additional information concerning the allegations of the complaint or the charges.  (*Id.* at 175; Ex. 7, ¶ 11.)  Inspector Herrle also did not tell Inspector Waldow the name of the complainant or any of the witnesses.  (*Id.* at 220; Ex. 7, ¶ Decl. 11.)  Inspector Waldow met with the Respondent that same day and told him to refer to officers only as "[O]fficer so and so."  (Ex. 1, ¶ 11, at 219.)

144.    Deputy Chief Thomas learned of the OPR investigation when an executive board member of the union emailed him questioning the Department's decision not to reassign Respondent pending the investigation.  (Ex. 1, ¶ 8, at 50.)  Because Deputy Chief Thomas had no information regarding the allegations in the complaint, he spoke with Inspector Herrle to determine whether reassignment was advisable.  (*Id.*)  Inspector Herrle did not recommend reassigning Respondent.  (*Id.*)  Inspector Herrle told Deputy Chief Thomas only that the complaint concerned remarks Respondent allegedly made in front of female officers.  (*Id.* at 52.)  Inspector Herrle did not disclose any other information concerning the allegations of the complaint or the identity of the complainant or witnesses.  (*Id.* at 55.)  Deputy Chief Thomas also was not aware at that time that Plaintiff was in Respondent's chain-of-command.  (Ex. 1, ¶ 8, at 55.)

145.    Chief Verderosa learned that Plaintiff was a witness in the OPR investigation only through the course of this litigation.  (Ex. 1, ¶ 9, at 130, 132.)

146.    Chief Dine learned that Plaintiff was a witness in the OPR investigation only after Plaintiff submitted her appeal of the termination recommendation, which alleged in part that she was being terminated because she had been a witness.  (Ex. 2, ¶ 19.)

147.    On August 18, 2015, Plaintiff was interviewed by Sergeant Mark Shutters as a witness in the OPR investigation.  (Ex. 9, ¶ 8.)  Before being interviewed Plaintiff only had a

vague sense of what the OPR investigation was about based on talk circulating among CD-3 officers.  (Ex. 1, ¶ 3, at 417.)  Plaintiff did not know what any of the allegations were.  (*Id.*)

148.     Before the interview, Plaintiff was informed of her rights and obligations during an OPR interview.  (Sourgoutsis Tr. 419.)  Plaintiff was told that she had to answer all questions truthfully and fully and signed a form-1009 agreeing to those conditions.  (Ex. 1, ¶ 3, at 419-20.) Plaintiff "100 percent" did speak truthfully and answer questions fully.  (*Id.* at 420.)  At the conclusion of the interview, Plaintiff provided a signed written statement summarizing the subject matter discussed during the interview.  (*Id.*; *see also* Ex. 9, at Ex. B.) Plaintiff further understood the OPR interview was recorded.  (Ex. 1, ¶ 3, at 419; *see also* Ex. 9, at Ex. C.)

149.     Plaintiff alleges that Respondent engaged in the following conduct: Called her "chica" or "senorita" rather than by her name on several occasions, (Ex. 1, ¶ 3, at 421-22.)  Chica means girl or young woman in Spanish.  (*Id.* at 421-22.)  Senorita means "Miss" or "unmarried female."  (*Id.* at 421-22.)

150.     Denied her request to leave early one night in June 2015, (Ex. 1, ¶ 3, at 422-23.) Plaintiff further alleged that Respondent allowed female officers he liked to "get the shorts that they wanted."  (*Id.* at 433.)  Respondent has granted Plaintiff's other short requests before.  (*Id.* at 437.)  Plaintiff also had no evidence that Respondent permitted an officer he liked to get the short she requested in June 2015 in lieu of Plaintiff.  (*Id.* at 437.)

151.     Told her after denying her request to leave early that he saw her Facebook profile picture, her hair was down, she had on make-up, and she looked good or nice.  (Ex. 1, ¶ 3, at 422-23.)

152.     Looked at her on one occasion when she was in civilian clothes. (Ex. 9, at Ex. B.)

153.     Frequently stood with his hands on his hips and thrust out his pelvic area repeatedly in roll call or at any given moment in the shift around male and female officers and officials.  (Ex. 1, ¶ 3, at 425-26; Ex. 9, ¶ 13.)

154.     Gave female officers he liked preferred assignments and breaks.  (Ex. 1, ¶ 3, at 434-35.)  Specifically, Plaintiff alleged that based on her visual observation Respondent assigned officers he liked to the Capitol Detail fire panel.  (*Id*. at 433.)  Plaintiff had been assigned to the Capitol Detail fire panel.  (*Id*.)  As part of his investigation, Sergeant Shutters reviewed schedules to determines whether a pattern of favoritism to female officers or certain female officers could be discerned, and found none.  (Ex. 1, ¶ 7, at 156-57.)  Sergeant Willis also told Sergeant Shutters during her OPR interview that based on the complaint of a male officer that assignments were not being distributed fairly, she also reviewed schedules when not to long after her arrival at the Capitol Division and determined that assignments were being distributed fairly. (Ex. 8, ¶ 9.)

155.     Looked at another female officer's butt.  (*Id*. at 440.)

156.     Stood in another female officer's personal space.  (Ex. 9, at Ex. C.)

157.     Told another female officer that he would have to "test out that theory one night" after she said, "The way to my heart is through my stomach." (*Id*. at 440-41.)

158.     During her OPR interview, Plaintiff stated that she did not know whether Respondent's hip thrusting was a nervous thing or tick.  (Ex. 9, at Ex. C.)

159.     Plaintiff told Sergeant Shutters during her OPR interview that she no longer found Respondent's behavior to create a hostile work environment.  (*Id*.)  Plaintiff stated that she simply ignored Respondent and that he does not exist to her.  (*Id*.)

160.    Plaintiff contends that Respondent's behavior continued after her August 2015, interview, but she never told anyone about it because "I did not want to be involved."  (Ex. 1, ¶ 3 at 443-44.)

161.    Plaintiff never told Respondent that she was a witness in an OPR investigation concerning a complaint filed against him.  (*Id*. at 451.)  Plaintiff also has no facts indicating that Respondent knew that she was a witness in the investigation.  (*Id*. at 463.)

162.    Sergeant Shutters completed the Report of Investigation ("ROI") in mid-December 2015.  (*See generally*, Report of Investigation, Ex. 9, at Ex. D.)  The report was transmitted to the Division for penalty determination in mid-January 2016.  (Ex. 7, ¶ 16.)

## XII.    PLAINTIFF FILES A REQUEST UNDER SECTIONS 402 AND 403 OF THE CAA

163.    Plaintiff filed a request for counseling pursuant to Section 402 of the Congressional Accountability Act on February 16, 2016 alleging violations of Sections 201 and 207 of the CAA.  (April 26, End of Mediation Notice, Ex. 1, at Attach. 11.)  The counseling period ended March 17, 206.  (*Id.*)

164.    Plaintiff filed a request for mediation on March 25, 2016 and the mediation period ended on April 25, 2016.  (*Id.*)

## XIII.   PLAINTIFF ALLEGES DEPARTMENT TREATED EMPLOYEES OF A DIFFERENT SEX MORE FAVORABLY

165.    Plaintiff generally contends that the Department's justification of her termination is pretextual because the Department treated male probationary officers, who purportedly committed more significant violations than she did during their probationary periods, more favorably.  (Declaration of Thomas DiBiase, ¶ 3, Ex. 10.)

166.     PVT 7 was appointed to the United States Capitol Police on August 1, 2011.  PVT

7 graduated from Recruit Officer Class ("ROC") 171 on January 20, 2012.  PVT's probationary

period began on August 1, 2011, and initially was to end on January 20, 2013.  (*Id*. ¶ 4.)

167.     During his probationary period, PVT 7 received a CP-534 on November 30, 2012

for violating Rule B10: Neglect of Duty when he was observed sleeping in the Check Point 3

kiosk on November 27, 2012.  (*Id*. ¶ 5.)

168.     During his probationary period, PVT 7 also received a corrective CP-550 on

September 5, 2012, for failing to adhere to the Department's grooming standards as it relates to

beard length and an information CP-550 on the same date indicating that he was provided the

policy as to this issue.  PVT 7 also was tardy in July 2012 and September 2012.  (*Id*. ¶ 8.)

169.     In addition, PVT 7 also had two CP-550s for failing to bring his USCP baseball

cap in violation of Academy rules and for speeding on base at FLTC.  During his probationary

period, PVT 7 also received the FLETC Director's Training Award, a recognition given to a

student who most exemplifies the core values of a federal law enforcement officer.   (Ex. 10, ¶¶

6, 7, 9.)

170.     On January 16, 2013, Inspector Matthew Perkins, Commander of the House

Division, recommended that PVT 7's probationary period be extended for six months in light of

deficiencies documented during PVT 7's probationary period. (*Id*. ¶ 9.)

171.     Deputy Chief Yancey Garner approved Inspector Perkins's extension

recommendation. (*Id*. ¶ 10.)

172.     PVT 8 was appointed to the United States Capitol Police on August 1, 2011.  PVT

8 graduated from Recruit Training Class ("ROC") 171 on January 20, 2012.  PVT 8's

probationary period began on August 11, 2011, and initially was to end on January 20, 2013. (*Id.* ¶ 11.)

173.    During his probationary period, PVT 8 received a CP-534 on November 20, 2012 for violating Rule A3: Compliance with Directives when on April 28, 2012, PVT 8 observed that a truck/trailer had not been stopped by the Interdiction officer and failed to stop the vehicle from proceeding through the checkpoint or radio Communications about the breach.  Assistant Chief Reynolds dismissed the CP-534 concerning the April 28, 2012, incident on appeal.  PVT 8 also received a CP-534 on November 29, 2012, for violating Rule B10: Neglect of Duty when PVT 8 was observed asleep while on post at the Rayburn Subway on November 26, 2012. (Ex. 10, ¶ 12.)

174.    PVT 8 was also tardy twice during his probationary period and used unscheduled leave on two occasions.  Use of unscheduled leave is not a violation of USCP policy, but is monitored and tracked by supervisors. (Ex. 10, ¶ 13)

175.    On January 6, 2013, Inspector Perkins recommended that PVT 8's probationary period be extended for six months as a result of these documented incidents.  Deputy Chief Garner approved the extension recommendation. (*Id.* ¶ 14.)

176.    Recommendations to extend a probationary employee's probationary period for discipline or performance is handled at the Bureau level.  The recommendation for extension by the Division Commander.  The Bureau Commander has final decision-making authority as to approval or denial of the recommendation. (*Id.* ¶ 15.)

177.    Recommendations to terminate a probationary employee come from the Division, must be approved by the Bureau Commander, the Assistant Chief of Police, the Chief of Police, and finally, the Capitol Police Board.  (*Id.* ¶ 16.)

178.    Comparators PVT 7 and PVT 9 probationary periods were both probationary employees in the House Division of the Uniformed Services Bureau ("USB").  As to both employees, the bureau commander had final decision-making authority as to extension of their probationary periods.  (*Id*. ¶ 17.)

## XIV.    USCP PROBATIONARY PERIOD POLICY AND DISCRIMINATION POLICY

179.    Directive 2052.004, Probationary Periods, became effective May 28, 2012.  (Ex. 1, ¶ 9, at Ex. 2; Ex. 1, Ex. 1, ¶ 5 at 17).  The policy sets forth a process by which to evaluate and provide ongoing feedback to sworn and civilian employees during their probationary period, including requiring quarterly performance evaluations and providing career development guidance.  (Ex. 1, ¶ 9, at Ex. 2; *see also* Ex. 1, ¶ 9, at 55-56, 58; Ex. 1, ¶ 5, at 32; Ex. 1, ¶ 8, at 22.)  The purpose of the quarterly evaluations is give probationary employees feedback and help them improve.  (Ex. 1, ¶ 9, at 59; Ex. 1, ¶ 8, at 60 ("[T]o provide employees with an idea of the performance standards for the organization, to rate their performance by their supervisor, and give them an opportunity to provide feedback to their supervisor in doing so."); Ex. 1, ¶ 4 at 25.)

180.    A probationary employee's first-line supervisor is required to provide quarterly evaluations under the policy.  (Ex. 1, ¶ 9, at Ex. 2, at 7; Ex. 1, ¶ 8, at 66.)  Directive 2052.004, Probationary Periods, states recommendations regarding potential termination during the probationary period should begin with the employee's first-line supervisor, but does not mandate that only a first-line supervisor may make such recommendations.  (Ex. 1, ¶ 9, at Ex. 2, at 6; Ex. 1, ¶ 9, at 160-61 ("There may be things that the inspector knows that sergeants don't know. There may be things that, observations made, you know maybe by a lieutenant that the sergeant doesn't know but the inspector does . . . . [A]nybody in the chain of command is really empowered to have that observation, and I expect that."; Ex. 1, ¶ 5, at 35 ("If a lieutenant has

more contact with a probationary employee and realizes this is not working out, this person has a lot of issues, they could certainly be the one to make that evaluation.").)

181.    Aside from the final probationary period summary completed by Inspector Waldow, probationary period quarterly evaluations were not completed for Plaintiff.  (Ex. 1, ¶ 9, at 66; Ex. 1, ¶ 11, at 208, 212, 214.)  Plaintiff Sourgoutsis also did not have a career development plan or PECs performance plan prepared, which would have been accounted for in the probationary period quarterly evaluations.  (*Id.* at 207, 213; Ex. 1, ¶ 8, at 63.)

182.    Because Plaintiff did not have probationary period quarterly evaluation reports in her file, Officials relied on all other available information in her unit jacket and central file in determining whether termination was the appropriate course of action, including: personal performance notes; discipline; FTO daily observation reports.  (Ex. 1, ¶ 9, at 68; Ex. 1, ¶ 8 at 26, 28, 61-62; Ex. 1, ¶ 11, at 165.)  Inspector Waldow also asked for input regarding Plaintiff from the captains, lieutenant, and sergeants responsible for CD-3.  (Ex. 1, ¶ 11, at 198; Ex. 1, ¶ 4 at 121; Ex. 1, ¶ 12 at 63; *see also*, Ex. 1, ¶ 12, at Ex. 1.)

183.    Plaintiff was not the only Capitol Division employee for whom probationary period quarterly evaluation reports, career development plans, or PECs performance plans were not done.  (Ex. 1, ¶ 9, at 162 ("[I]t's fairly consistent[ ] that those areas were not covered in terms of eval[uations] and that kind of thing really over the last five years."); Waldow Tr. 221; Waldow Decl. 6.)  Indeed, Inspector Waldow determined that *no* probationary employee in the Capitol Division in ROC 176, 177, or 178 had all probationary period quarterly evaluation reports completed.  (Ex. 7, ¶ 6.)

184.    The reason these reports were not completed was due to significant shortages in the Department's operations overall.  As Chief Verderosa explained:

> [D]uring the period since sequester in 2010 we have been critically short of supervisory personnel to the tune of about probably one-third short sergeants and [fifty] percent short lieutenants and that's the bulk of the first-line supervisors.
>
> ****
>
> I was the [C]hief who was fortunate enough to receive funding to replenish, and we are now getting to the point where we're almost at full staffing in those areas, and [administrative requirements] are the areas we're trying to improve in where because [operations] was so important and in protecting the icon and protecting, getting the mission done things got sidetracked in terms of some of the administrative responsibilities.

(Ex. 1, ¶ 9, at 161-62.)

185.    The dearth of supervisors particularly had a detrimental effect on Capitol Division first- and second-line supervisors: "Unfortunately, until recently, we had significant shortages . . . on the supervisory side.  So at times, administrative functions fall to the wayside while we try to maintain operations.  It's a very high operational tempo at the Capitol."  (Ex. 1, ¶ 11, at 208.) Sergeant Willis explained the challenge she faced as a first-line supervisor at the Capitol Division and why she was unable to provide midterm counseling and other evaluations as required by Directive 2052.004: "There were a lot of events going on.  It was very busy [at the Capitol Division], short-staffed.  It just – it didn't happen."  (Ex. 1, ¶ 12, at 32.)

186.    Directive 2053.011, Anti-Discrimination and Anti-Harassment policy states, "Discrimination and harassment on the basis of race, age,color, sex (including sexual harassment), genetic information, national origin, disability, religion, and/or service in the uniformed services are prohibited and will not be tolerated." (Ex. 1, ¶ 9, at Ex. 4, Directive 2053.011, Anti-Discrimination and Anti-Harassment at 2.)  The policy further encourages employees to immediately report any act of discrimination or harassment.  (*Id.*)  The policy is disseminated to employees via the Department's intranet; it is also given to new employees

40

during orientation; and the Chief of Police issues an annual notice of the policy via email, which

is also required to be read at roll calls.  (Ex. 1, ¶ 5, at 16, 18, 19.)


Date: October 27, 2017                    Respectfully submitted,

                                          /s/ Kelly M. Scindian

                                          Frederick M. Herrera #423675
                                          Kelly M. Scindian #985787
                                          Rafique O. Anderson #493243
                                          Office of Employment Counsel
                                          United States Capitol Police
                                          119 D Street NE
                                          Washington, DC 20510
                                          Telephone: (202) 593-3336
                                          Facsimile: (202) 593-4478
                                          Frederick.Herrera@uscp.gov
                                          Kelly.Scindian@uscp.gov
                                          Rafique.Anderson@uscp.gov

                                          *Counsel for the United States Capitol Police*