# EXHIBIT 5

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CHRISAVGI SOURGOUTSIS,                    )
                                          )
                    Plaintiff,            )
                                          )
            v.                            )        Case No. 1:16-CV-01096-KBJ-RMM
                                          )
UNITED STATES CAPITOL POLICE,             )
                                          )
                    Defendant.            )
                                          )

## DECLARATION OF JOSEPH MOROZIEWICKI

I, Joseph Moroziewicki, have personal knowledge of the following facts and will testify
to them, if called to do so:

1.      I began working at the United States Capitol Police in June 2000. I was promoted
to the position of Sergeant in September 2011. I have worked in the Uniformed Services Bureau,
Capitol Division since my promotion. From September 2011 to March 2017 I worked as a
Sergeant on Shift 3, also known as "CD-3." I supervised both CD-3 and First Responders Unit,
Shift 3, also known as "FRU-3." I have an Associates Degree in Law Enforcement
Administration from Wayne County Community College.

2.      I met Plaintiff Chrisavgi Sourgoutsis when she was assigned to CD-3 in
November 2014. During the time that Plaintiff worked on CD-3, which was approximately
November 2014 through November 2015, my chain-of-command was as follows: I reported to
Lieutenant James Leonard, the Section Commander; Captain Andrew Bolinger, Operations
Commander; Inspector Eric Waldow, Division Commander; and Deputy Chief Chad Thomas,
Bureau Commander. In addition to me, Sergeant Maria Willis and Sergeant Tyrone Vias were
the Sergeants on CD-3.

1

3.      Plaintiff reported to Sergeant Maria Willis, but as a Sergeant on CD-3 I also had operational oversight as to Plaintiff on a daily basis. I had the opportunity to observe Plaintiff's work performance. She performed for the most part at "meets expectations." Generally, Plaintiff showed up for work and did the job as required.

4.      On May 11, 2015, a radio call went out for a FRU supervisor to respond to the unit number of Officer Bryant Williams located on the center plaza, east front of the U.S. Capitol. The Department provides officers with radios to communicate with the radio section and different units. I responded to the call sometime between 4:30 p.m. and 4:45 p.m. I spoke to Officer Williams who informed me that he observed Plaintiff Sourgoutsis at her post on the east front of the U.S. Capitol outside of the doors of the Capitol Visitor Center ("CVC") sitting down, talking on her cell phone, and talking to a civilian. Officer Williams was concerned that Plaintiff was creating an unsafe condition. He also told me that he had taken a picture, which he provided to me via text. A true and correct copy of the picture Officer Williams provided is attached as Ex. A. Officer Williams asked that I not disclose that he had been the one to report Plaintiff.

5.      At the time I arrived, Plaintiff Sourgoutsis was still at her post. It appeared to me that she was standing and being attentive. I did not observe any infraction. For that reason, I did not feel the need to address Plaintiff at that time since she was at the post and appeared to be doing her job.

6.      In the photograph, Plaintiff Sourgoutsis is sitting casually on a planter bed wall with her legs crossed and arms around her legs. She is talking to someone who is not a police officer and her back is to the door she should be securing. In this position, Plaintiff Sourgoutsis is not prepared to take action. A person could have approached from her side and she would not have been able to neutralize the threat. USCP officers are supposed to maintain a tactical

2

position, which is a position that would enable them to observe, detect, and respond to any incident.

7.      Moreover, the location of Plaintiff's post was directly outside of the entrance to the CVC, which is the point of access for all visitors to the U.S. Capitol, including persons at the U.S. Capitol on business and tour groups from all over the country and the world.  Before 5:00 p.m. on a Monday afternoon, many people are entering and exiting the CVC and would have seen Plaintiff Sourgoutsis.  Thus, Plaintiff Sourgoutsis would have been the first impression visitors to the CVC would have of the U.S. Capitol and United States Capitol Police.

8.      I spoke with Lieutenant Leonard that same day concerning the information Officer Williams relayed and provided Lieutenant Leonard with the photograph.  Lieutenant Leonard told me that he would discuss the matter with Captain Bolinger.

9.      On or about May 12, 2015, Lieutenant Leonard informed me that Captain Bolinger wanted me to pull video of the incident and to question Plaintiff Sourgoutsis about the incident.  I was told that Captain Bolinger would decide what to do after we received Plaintiff Sourgoutsis' answers.

10.     I attempted to pull video from taken at the time of the May 11, 2015, incident that would show activity on Plaintiff Sourgoutsis' post, but the camera picture was blocked by the trees and, thus, was unhelpful.

11.     I met with Plaintiff Sourgoutsis on May 19, 2015 to question her about the incident.  In attendance at this meeting were Sergeant Willis, Plaintiff Sourgoutsis, and a union representative Officer Terrence Lacey.  I had Plaintiff Sourgoutsis review and sign a form CP-1009, Rights and Responsibilities Relative to Administrative Investigations, which explains the rights of an officer being interviewed in connection with an investigation and specifically states

3

that the officer is compelled to answer all questions truthfully and fully. A true and correct copy of the CP-1009 is attached hereto as Ex. B.

12.     Once she signed the CP-1009, I asked Plaintiff Sourgoutsis questions and I had Plaintiff Sourgoutsis write in her responses to the questions. A true and correct copy of the document containing questions presented to Plaintiff Sourgoutsis and her answers thereto is attached hereto as Ex. C. The meeting with Plaintiff Sourgoutsis lasted approximately twenty minutes.

13.     Plaintiff Sourgoutsis admitted that she was sitting down and talking to an Architect of the Capitol employee. She also stated that she had used her cell phone to contact Sergeant Vias. Plaintiff Sourgoutsis did not need to use her cell phone to contact Sergeant Vias. That is one of the purposes of having a radio – so that she can reach out to supervisors for assistance.

14.     Plaintiff Sourgoutsis accepted responsibility for sitting on the wall and talking on the phone, but she attempted to deflect most of the blame to Sergeant Vias who she claimed should have told her to be prepared by bringing items such as water and sunglasses when she was posted outside. Plaintiff Sourgoutsis also indicated that she understood that sitting on the planter bed wall while on post was not a safe practice while in close contact and in full view of the public. She stated that she only sat because of the smell of the fumes.

15.     Directive 1040.002, Security Screening Policy, requires officers to stand at all times when conducting security screening. When not actively conducting screening functions, officers must monitor individuals in the area. Officers must avoid distractions from screening duties. Officers are prohibited from using cell phones and other electronic devices while

4

conducting security screening activities and when at a duty post unless otherwise authorized by policy.

16.     After the meeting, Captain Bolinger instructed me to write a Command Discipline Report (CP-534) documenting a violation of Directive 2053.013 Rules of Conduct; Category B; Performance of Duty; Rule B10: Neglect of Duty. The rules specifies that employees will devote their full time and attention to the performance of their duties at all times while on duty. A true and correct copy of the CP-534 is attached hereto as Ex. D.

17.     In 2015, I was aware that there was an investigation of Sergeant ███ allegedly engaging in improper remarks as to female officers. I was not questioned or interviewed as part of the investigation. I recall that I overheard Officer ████████ and another officer discussing the investigation, but I was not a part of the discussion. It was not until I read the complaint in the above-listed action that I was informed of the details.

18.     I had daily interactions with Sergeant ███ as the Sergeants were all located in the Capitol Detail Office. I never heard Sergeant ███ refer to a female officer as Chica, Senorita, or Muchacha. Sergeant ███ is rather shy and nervous when talking with people. I have witnessed him rock on his heels when speaking with other officers. This appears to be a nervous tick. I have never witnessed Sergeant ███ engage in any behavior of a sexual or inappropriate nature as described in the complaint.

19.     I had no role in the decision to terminate Plaintiff Sourgoutsis. I recall that she was placed on administrative leave, but no one discussed it with me before this occurred.

*       *       *       *       *

5

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this _/8_ day of October 2017.

Joseph J. Moroziewicki

# EXHIBIT A



# EXHIBIT B



UNITED STATES CAPITOL POLICE

**RIGHTS AND RESPONSIBILITIES RELATIVE TO
ADMINISTRATIVE INVESTIGATIONS**

CP-1009
(06/10)

*(Please Type or Print Legibly)*

## RIGHTS AND RESPONSIBILITIES

This is to advise you that you are being interviewed as part of an internal administrative investigation into alleged misconduct. You will be asked questions specifically, directly, and narrowly related to the performance of your official duties or your fitness for duty. Bargaining Unit officers who reasonably believe that this examination or investigation may result in disciplinary action may request Union representation.

You are compelled to **truthfully and fully** answer all questions posed by a supervisor of the United States Capitol Police (USCP) relative to official Department business and/or pertaining to your official duties or fitness for duty (USCP Operational Directive PRF 1.3, **Rules of Conduct**, Category A: **Duty to Obey**; Rule A3: **Compliance with Directives**; Rule A6: **Insubordination**; and Rule A7: **Truthfulness**). If you refuse to answer, you will be subject to disciplinary action which could result in the termination of your employment. If you do answer, neither your statements, nor any information or evidence which is gained by reason of such statements, can be used against you in any subsequent criminal proceeding; however, such statements may be used against you in relation to subsequent Departmental disciplinary action(s). (see Garrity v. New Jersey, 385 US 493 (1967)).

You are also advised that if you willfully and knowingly make an untruthful statement, verbally or in writing, pertaining to your official duties or fitness for duty as an employee of the United States Capitol Police, to or in the presence of any supervisor or intended for the information of any supervisor, or make any untruthful statements before any court or any authorized government official, you will be subject to such disciplinary action as the Chief of Police may deem appropriate. (USCP Operational Directive PRF 1.3, **Rules of Conduct**, Category A: **Duty to Obey**, Rule A7: **Truthfulness**)

## CERTIFICATION

I hereby certify that I have read or otherwise been advised of my rights, duties and responsibilities with regard to this interview. I further certify that I fully understand them, and that I have received no promises or guarantees of any kind relative to any statement I may give.

| NAME OF RECIPIENT (Please print) | SIGNATURE OF RECIPIENT | DATE |
|---|---|---|
| CHRISAVGI SOURGOUTSIS | *Chrisavgi Sourgoutsis* | 05/19/2015 |
| SIGNATURE OF SUPERVISOR CONDUCTING INTERVIEW | | DATE |
| *[signature]* | | 5/19/2015 |

# EXHIBIT C

# Respondent: Chrisavgi Sourgoutis #6713 CD-3

## Questions and responses- North Mezzanine- CVC 5/11/2015 1500-1700

On Monday, 5/11/2015 at 1500-1700 you were assigned outside at the North Mezzanine of the CVC.  You were posted at a unsecured door while AOC worked in the area.

1. <u>Did you understand your duties and responsibilities for that post?</u>

Yes.

2. <u>What were you duties and responsibilities for that post?</u>

As per Sgt Vias, I was told to secure the door that the AOC was working on. I was told to make sure that no visitor walked through the door. I did that.

3. <u>Directive UNF 1.1 Uniform, Equipment, and Personal Grooming is the directive on wearing headgear. Did any supervisor give you authorization not to wear your headgear while assigned to this post?</u>

No.

**Respondent: Chrisavgi Sourgoutis #6713 CD-3**

**Questions and responses- North Mezzanine- CVC 5/11/2015 1500-1700**

4. <u>Why weren't you wearing your headgear while you were assigned to this post?</u>

I took off my headgear a few times because I was very hot. It was 3 pm and I was outside from 3 pm - 5:15 pm (approximately) without any breaks, water or sunglasses. It was a hot day and there was no official

<u>Directive 2053.013 Rules of Conduct, Category B- Performance of Duty Rule B. 10:</u>
<u>Neglect of Duty. It states that employees will devote their full time and attention</u>
<u>to the performance of their duties at all times while on duty.</u>

5. <u>While you were assigned to this post you were observed on a cell phone.</u>

<u>Was this call in performance of your duties?</u>

Yes. I called Sgt Vias to tell him that the workers here working post 5 pm. He told me "Call me if they're not done by 5 pm"

<u>If this was a personal phone call was it an emergency?</u>

N/A. Not a personal call.

<u>If it was an emergency did you contact a supervisor to notify them of a</u>

<u>Emergency?</u>

N/A. Not an emergency.

<u>Did any officer relieve you so you could utilize the cell phone?</u>

No. An officer finally came circa 5:15 pm to relieve me so I could move to my next post.

4. outside to ask if it was appropriate to take my hat off due to the fact that I was uncomfortable in the heat. Also, the fumes from the laque that the workers were spraying also added to the discomfort of the situation. That is why I took my hat off a few times. It wasn't to be disrespectful or break the general orders.

5. I needed to go to another post and I didn't want to push late. I called Sgt Vias to inform some one to relieve me. This was a duty call. I didn't make any personal calls. At any point.

Respondent: Chrisavgi Sourgoutis #6713 CD-3

Questions and responses- North Mezzanine- CVC 5/11/2015 1500-1700

On 4/10/2015 you attended Tactical Positioning Training. One of the aspects of the training is that sitting on post puts you at a tactical disadvantage. Officers are only authorized to sit on post during times of inactivity or when authorized.

6. <u>You were observed sitting on the planter bed wall of the North Mezzanine of the CVC while on post.</u>

<u>Is this a safe practice while in close contact and in full view of the public?</u>

No. I sat down a few times b/c of the smell of the fumes. It was literally unbearable. The men spraying the door had a face mask on - the smell was toxic.

<u>Was this authorized by a supervisor?</u>

No.

<u>Was this during a break period?</u>

No. I didn't get a break.

<u>Did anyone break you to do this?</u>

No.

7. <u>Do you think that sitting on a wall while talking on a cell phone and without your headgear on projects a professional image of the department?</u>

When I made the phone call I wasn't sitting down. I sat down b/c it was out of the way of the laque smell that I had been →

7.  Smelling for 2 1/2 hours.

It was unprofessional to take my hat off
& sit down for a moment. I apologize
for doing so.

I felt upset w/ my official for not
telling me to better prepare myself. He
didn't tell me to bring water with me. he didn't
tell me to bring sunglasses and he didn't
end one
some to break me or even offer some to break me.
to
It was a hot day and it was uncomfortable
to be out there as long as I was with
no water or break.

I used my phone <u>for work</u> and to
check the time to make sure the time
wont past 5 pm. I did the best I
could under the circumstances. I would most
certainly call myself a professional, albeit their particular
circumstances

# EXHIBIT D



# UNITED STATES CAPITOL POLICE
## WASHINGTON, DC 20510–7218

### COMMAND DISCIPLINE REPORT

CP Form 534  Rev. 6/2008

---

**1.**   **EMPLOYEE:** ___( Officer )___ Chrisavgi Sourgoutis
                        Rank / Title

DATE: ___June___ / ___2___ / ___2015___          S.S.N.: ___On___ _ ___File___ _ ___OHR___
         Month        Day        Year

DIVISION: Capitol Division - Section Three          DATE OF APPOINTMENT: 05/11/2014

VIOLATION:

Directive # 2053.013 Rules of Conduct; Category B; Performance of Duty: Rule B10: Neglect of Duty: Employees will devote their full time and attention to the performance of their duties at all times while on duty.

---

**2.**   **DETAILS OF VIOLATION:**

On Monday May 11, 2015, at approximately 1650 hours, this reporting official was provided with photo documentation of Officer Sourgoutis sitting on a garden retaining wall of the North Mezzanine area of the CVC having a conversation with a citizen. Officer Sourgoutis was given an assignment to open an egress door in that area to provide AOC personnel an opportunity to complete their work. Officer Sourgoutis was seen with her attention diverted away from the open door.

Officer Sourgoutis was not in a tactical position to visually inspect individuals approaching the open door, to determine authorization by ensuring proper credentials, or to observe for weapons, explosive devices, and other suspicious or prohibited weapons.

Officers assigned to open doors will stand in a tactical position and assume responsibilities as indicated. Officers are to remain aware of all activities occurring within their assigned area of responsibility. This is a best practice for the Department to ensure appropriate situational awareness. Officer Sourgoutis failed to devote her full time and attention to her duties.

Reporting Official: ___Sergeant Joseph J. Moroziewicki___          Date: ___05/11/2015___

---

**3.**   **SECTION COMMANDER:**

PREVIOUS RELATED VIOLATIONS ON FILE:

None on File

Section Commander: ___Lieutenant James F. Leonard___          Date: ___05/11/2015___

**4.   DIVISION COMMANDER:**

STANDARD OF PENALTY REMARKS:

Consultation with OPR determined range consistent with 8 hours with no prior related violations on file to 16 hours with prior related violations on file.

☐   Filed with Warning.
☒   Forfeiture of __16__ Hours of Time/Pay.
☐   Other:

Division Commander: Captain Andrew D. Bolinger          Date: 6/2/15

**5.   TO BE COMPLETED BY EMPLOYEE:**

I understand that I do not have to accept the findings and/or the penalty or action of the Division Commander. My options regarding this matter have been explained to me. I understand that if I choose to appeal or grieve any part of this action, I must submit the appeal or grievance, in writing, within fifteen (15) calendar days, beginning the next calendar day from the date I am presented with this CP–534.
I Voluntarily:

☐   Accept the findings and the penalty of this disciplinary action.

☐   Will appeal the findings and/or the penalty of this disciplinary action to the Chief of Police, or his designee.

☒   Will grieve the findings and/or disciplinary action in accordance with the CBA.
(Applicable to civilian bargaining unit employees; and to sworn bargaining unit employees only in cases involving the forfeiture of time/pay.)

Employee: Chrisaugi Sourgoutsis          Date: 06/02/15

**6.   BUREAU COMMANDER/OFFICE DIRECTOR'S REVIEW:**

Bureau Commander: _____          Date: _____

**7.   APPEAL/GRIEVANCE DISPOSITION:**

Chief or Designee: _____          Date: _____

CP Form 534