# EXHIBIT 8

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CHRISAVGI SOURGOUTSIS, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> UNITED STATES CAPITOL POLICE, ) <br> ) <br> Defendant. ) | Case No. 1:16-CV-01096-KBJ-RMM |

### DECLARATION OF MARIA A. WILLIS

I, Maria A. Willis, have personal knowledge of the following facts and will testify to them, if called to do so:

1. I began working with the United States Capitol Police in October 2003. I was promoted to Sergeant in March 2014. In approximately late January 2015, I was transferred to the Uniformed Services Bureau, Capitol Division, Shift 3, also known as "CD-3." I remained on CD-3 until approximately September 2016 when I was transferred to my current assignment in the Mission Assurance Bureau, Communications Section.

2. During my tenure, CD-3 consisted of approximately twenty-eight officers; three Sergeants, including myself, Sergeant Joseph Moroziewicki, and Sergeant Tyrone Vias; and one Lieutenant. Numerous Lieutenants were transitioned into and out of CD-3 when I was assigned there, including Lieutenant Stephanie Bloxson, Lieutenant James Leonard, and Lieutenant Michael Byrd. I also recall that CD-3 had an acting Lieutenant at one point.

3. During my tenure, the Captains in the Capitol Division included Yogananda Pittman, Sean Gallagher, and Andrew Bolinger. Inspector Eric Waldow was the Division Commander. Initially, Deputy Chief Chad Thomas was the Bureau Commander and then

Deputy Chief Richard Rudd transitioned into that role.

4. As I testified in my deposition in this matter, I was a witness in an Office of Professional Responsibility ("OPR") investigation in approximately August 2015. The investigation concerned a complaint filed against my colleague Sergeant ███. I learned of the investigation when the OPR investigator, Sergeant Mark Shutters, telephoned me and asked that I assist in coordinating the interviews of witnesses to the investigation. Sergeant Shutters sought to interview sixteen officers in connection with the investigation. Although Sergeant ███ was the Administrative Sergeant responsible for scheduling, I was acting in that capacity while he was out on leave. Therefore, I scheduled the OPR interviews for each officer on CD-3 Sergeant Shutters requested to interview in August 2015.

5. When I spoke to Sergeant Shutters over the telephone and later via email, I did not know who the subject of the investigation was or what the alleged violation was. It was not until I was interviewed on August 13, 2015 that I became aware that Sergeant ███ was being investigated for allegedly making improper remarks towards female officers, making sexual advances toward female officers, arranging to give female officers preferred posts or assignments, and thrusting his pelvis or groin at female officers in a sexual manner.

6. As I told Sergeant Shutters during my interview, I overheard Sergeant ███ refer to female officers as "senorita" in the past, and I noticed that he called female officers by their first name instead of "Officer X." I also told Sergeant Shutters that I spoke with Sergeant ███ and raised my concerns about the manner in which he addressed female officers. I asked Sergeant ███ whether he called male officers by their first name and I informed him that he should be consistent in the manner in which he refers to male and female officers. I got the impression that Sergeant ███ was not aware that he addressed female and male officers

2

differently until I brought it to his attention. Following my discussion with Sergeant ███, I do not recall him ever addressing female officers in that way again.

7. I was surprised by the other allegations that were being lodged against Sergeant ███ as explained to me by Sergeant Shutters. When I was at the Capitol Division, I was a very active Sergeant when I was on duty. I was constantly walking around to different posts in the U.S. Capitol to check on the officers and to assure no one needed assistance. Given that I did rounds frequently, I believe I would have seen the type of misconduct raised in the complaint. I never saw anything that would suggest that Sergeant ███ was making sexual advances toward female officers or that he was thrusting his groin at them in a sexual manner.

8. Sergeant ███ is shy, quiet, and can be socially awkward. I recall that when he talked to male and female officers and officials he would often rock his body back and forth. I did not perceive this action as sexual. It appeared to be a nervous tick. I am not sure if this action is what the complaint filed with OPR was referring to when it alleged that he thrust his pelvis or groin at female officers. If this action is what the complaint is referring to, then it mischaracterizes what Sergeant ███ was doing. When Sergeant ███ rocks back and forth, he is not thrusting his pelvis or groin and the action is not objectively sexual in nature.

9. I also informed Sergeant Shutters that officers generally complain about schedule assignments. For example, officers would generally complain that they believed they were constantly getting poor post assignments. I recall that not long after got to the Capitol Division, a male officer complained about the post assignments. I looked at the schedule for the preceding two months and I determined that Sergeant ███ was fair when it came to assignments. Generally, the majority of officers are rotating to the alleged least desired posts at about the same rate. I have no reason to believe that Sergeant ███ was giving female officers preferential posts.

3

10. I never discussed the OPR investigation concerning Sergeant ▮▮▮ with any one in my chain-of-command. OPR specifically tells witnesses to an investigation that they should not reveal any information about the investigation and I complied with that directive.

* * * * *

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 20 day of October 2017.

*Sgt. Maria F.* [signature]

Maria A. Willis

4